**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARSH & McLENNAN AGENCY, LLC, | Case No.: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| ALLIANT INSURANCE SERVICES, INC., JOHNNY OSBORNE, MARGUAX STONE, and RACHEL MURRAY | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Marsh & McLennan Agency, LLC ("MMA"), by and through its attorneys, Epstein Becker & Green P.C., as and for its Complaint against Alliant Insurance Services, Inc. ("Alliant"), Johnny Osborne ("Osborne"), Margaux Stone ("Stone"), and Rachel Murray ("Murray," and together with Alliant, Osborne, and Stone, collectively "Defendants"), hereby alleges as follows:

## INTRODUCTION

1.      Alliant has spent the past decade building its business on a foundation of theft and deception. Time and again, Alliant has demonstrated its unwillingness to compete lawfully, opting instead to orchestrate coordinated raids that target competitors' most valuable employees, misappropriate confidential information, and poach lucrative client relationships. This predatory scheme, which Alliant has dubbed its "leveraged hire strategy," is as deliberate as it is destructive, and its hallmarks—intentional breaches of contractual and fiduciary duties, client solicitation, and concealment efforts—have earned it notoriety in the insurance industry and courts across the country. It has now set its targets on MMA.

2.      MMA's ordeal began on Monday, December 16, 2024, when Johnny Osborne, a producer in MMA's Huntsville, Alabama office, and his two key team members, Rachel Murray

and Margaux Stone, simultaneously resigned without notice to join Alliant. MMA did not initially learn of Osborne's resignation from Osborne himself, but through a series of alarming discoveries made by MMA's Huntsville, Alabama office manager earlier that morning. During a routine review of surveillance footage from the weekend, the office manager noticed Osborne entering the office on Saturday, December 14, 2024, and making multiple trips to his car with three large boxes and other materials. Curious as to why Osborne would visit the office on the weekend and remove so much material, the office manager inspected Osborne's office and found it completely empty—not even a single piece of paper remained. When confronted, Osborne admitted he was resigning to join Alliant.

3.      This ambush—executed with precision and forethought—was not simply a case of employees seeking better opportunities. It was the culmination of months of covert planning and misconduct, all orchestrated by Alliant. From October 2024 onward, Osborne and his team, acting under Alliant's direction, systematically disregarded their obligations to MMA. Osborne collected and duplicated confidential client data, recruited his team, and engaged in pre-resignation client solicitation, which he is now continuing at Alliant—in deliberate breach of his obligations under his restrictive covenants with MMA.

4.      The timing of these resignations was no coincidence. Alliant intentionally orchestrates such departures on Monday mornings to deprive competitors of the weekend to try to secure its business relationships. Osborne himself ensured maximum disruption, choosing a date when MMA's local leader was out of town. By the time MMA discovered the resignations, the damage was already well underway. Within 24 hours, at least four of Osborne's clients had elected to move their business to Alliant. By the end of that week, the number had risen to at least 16, and shows no signs of slowing.

5.    This raid is not an isolated incident but part of a broader pattern. Alliant's "leveraged hire strategy" is a blueprint for unlawfully expanding its market share at competitors' expense. Alliant's tactics include recruiting employees to act as "double agents," inducing them to misappropriate confidential information, and providing legal cover through sham protocols and fabricated job postings. Alliant's outside counsel even advises employees to avoid written communications that could reveal their breaches of duty (and to destroy any incriminating documents that may inadvertently be created), ensuring that evidence of wrongdoing is minimal and plausible deniability is preserved.

6.    Through this action, MMA seeks injunctive relief, damages, and all other remedies available to halt Alliant's predatory practices and prevent further irreparable harm to MMA because of Alliant's unlawful actions.

## **THE PARTIES**

### **A. Plaintiff Marsh & McLennan Agency, LLC**

7.    MMA is an insurance brokerage and risk management firm that provides risk management, insurance, and employee benefit support services to its clients. MMA operates brokerage offices and businesses across the United States. MMA is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business in White Plains, New York. MMA is an indirect subsidiary of Marsh & McLennan Companies, Inc. ("MMC"), a publicly held corporation traded on the New York Stock Exchange, which is incorporated in Delaware with its principal place of business in New York, New York.

**B. Defendant Alliant Insurance Services, Inc.**

8.     Alliant is now a corporation organized and existing under California law, with its principal place of business in Newport Beach, California.[1] Alliant does business and maintains offices throughout the United States, including in New York, where it is registered to do business and maintains six offices (including two offices located in New York City). Like MMA, Alliant is in the business of providing insurance brokerage, risk management and employee benefit support services. MMA and Alliant are direct competitors.

**C. Individual Defendants / Alliant's Co-Conspirators**

9.     Johnny Osborne is an individual who, upon information and belief, is a citizen and resident of Alabama. Osborne is a former MMA employee and a current employee of Alliant. Osborne worked for MMA in Huntsville, Alabama from on or about January 13, 2017, until he resigned on December 16, 2024, to join Alliant.

10.     Margaux Stone is an individual who, upon information and belief, is a citizen and resident of Alabama. Stone is a former MMA employee. Stone worked for MMA in Huntsville, Alabama from on or about January September 30, 2021, until she resigned on December 16, 2024, to join Alliant.

11.     Rachel Murray is an individual who, upon information and belief, is a citizen and resident of Alabama. Murray is a former MMA employee. Murray worked for MMA in Huntsville, Alabama from on or about January September 30, 2021, until she resigned on December 16, 2024, to join Alliant.

---

[1] Until January 2020, Alliant was a Delaware corporation. But after a privilege waiver in a proceeding in the Delaware Chancery Court allowing the plaintiff and the court to peel back the curtain on Alliant's schemes, which resulted in the court's issuing a scathing opinion laying bare Alliant's unlawful conduct, Alliant fled the jurisdiction, dissolving its incorporation in Delaware, and re-incorporating in California.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 (diversity of citizenship) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

13.      This Court also has subject matter jurisdiction over MMA's claims under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction) because the Complaint alleges a claim for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832 *et seq.*, and MMA's other claims are so related to its federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

14.      This Court has personal jurisdiction over Alliant because Alliant conducts business in this District and has committed tortious acts within the State of New York or has directed its tortious conduct toward the State of New York.

15.      Personal jurisdiction exists over Osborne, Stone, and Murray because in the agreements that they executed with MMA, detailed below, they each agreed to the jurisdiction of this Court in connection with any action arising in connection with those agreements or with their employment with MMA. Osborne's, Stone's, and Murray's breaches of their obligations under those agreements and their breaches of fiduciary duty during their employment with MMA are the subject of this Complaint.

16.      Venue is proper in this District pursuant to 28 USC § 1391(b)(2) and § 1391(b)(3) because the agreements signed by Osborne, Stone and Murray with MMA, which are the subject of the breach of contract claims set forth herein, contain a Governing Law and Choice of Forum provision, designating courts in New York County or the United States District Court for the Southern District of New York as the exclusive venue for resolution of disputes between the parties. Further, MMA maintains its principal place of business in this judicial District.

## FACTUAL ALLEGATIONS

I.    **Background**

    A.    **The Insurance Brokerage Industry**

    17.    The insurance brokerage industry is highly competitive. MMA and Alliant are direct competitors.

    18.    Insurance brokers are intermediaries between their customers and insurers. The role of a broker is to analyze the insurance market and match the brokerage's customers with insurers capable of meeting the customers' insurance needs. Once a broker has identified appropriate insurers and secured offers for insurance coverage, the broker helps the customer choose from competing offers. This is a complex process; it is not simply a matter of choosing the lowest bid. A broker must help the customer analyze factors such as the breadth of coverage, the risk management services provided by the insurers, the insurer's reputation, and the ability of an insurer to meet the customer's unique needs. A broker's role is not limited to insurance placement. A broker also provides customers risk of loss management as well as management of employer sponsored benefits programs.

    19.    Insurance brokerages typically generate revenue through brokerage fees and commissions from insurers on policies sold. Commissions are typically based on a percentage of the policy premium paid by the customer, and sometimes include contingent commissions based on factors such as the profitability or volume of insurance the broker places with the insurer. Additionally, brokers sometimes have arrangements where they receive a fee from the customer instead of commissions on premiums.

    20.    Large insurance brokerages like MMA provide brokerage services to a wide variety of businesses and organizations, including commercial, not-for-profit, and public entities. Because customer-specific and industry-specific knowledge is required to provide effective service to

customers, insurance brokerage companies are often organized around industry groups. Client-service teams are formed within these industry groups to service particular clients.

21.    Employees of an insurance brokerage who are primarily responsible for developing and maintaining client relationships are referred to in the industry as "Producers." Producers assume the lead, client-facing role and manage other members of their client-service teams. Becoming a successful Producer takes years of experience as well as significant training and information, knowledge and expertise provided to the Producer in confidence by the brokerage firm. Accordingly, insurance brokerages typically invest substantial resources over a period of years to develop successful Producers.

**B.    MMA's Investments In Its Personnel, Client Relationships, and Confidential Information**

22.    MMA invests substantial resources in attracting, developing, maintaining, and servicing its clients. Those investments benefit MMA's employees and enable them to effectively service a large and diverse client base.

23.    MMA invests substantial resources in its personnel to develop employees into successful Producers and members of client-service teams. MMA's investment in its Producers and other members of its client-service teams enables MMA's employees to learn significant client-specific knowledge. Over a period of years, MMA's employees gain experience selling and placing insurance with specific clients, handling claims for specific clients, and developing an understanding of a client's current insurance needs as well as its historical needs and preferences.

24.    MMA has, over many years and at great effort and expense, developed, accumulated, maintained, and refined trade secrets and other confidential information, including, among other things, client-specific pricing, key client contacts, client-specific manuals, client-specific marketing and servicing strategies, exposure and rating information in the pricing of

7

clients' insurance/reinsurance products, buying trends, the composition and the unique risks inherent in a clients' operations, details concerning the structure, conditions, and extent of insurance/reinsurance policies, policy expiration dates, premium amounts, commission rates, loss history, timing of renewals, data relating to MMA's unique marketing and servicing programs, the criteria and formulae used by MMA in pricing insurance and benefits, and compensation information for MMA employees. (MMA's confidential and proprietary trade secrets and other confidential information, including the types listed here, are referred to herein as "Confidential Information").

25.    MMA shares Confidential Information with its employees, provided they agree that it remains MMA's property, will remain confidential, and will not be misused by them for the benefit of another.

26.    MMA's Confidential Information enables it to maintain the client relationships in which it has invested. If such information were obtained by a competitor, MMA's investment in a particular client relationship would be jeopardized. Misappropriation, theft, or use of MMA's Confidential Information would allow a competitor to unfairly identify, contact and divert MMA's clients, causing substantial loss of revenue to MMA and financial gain to the competitor.

27.    MMA carefully protects its Confidential Information. Among other safeguards, MMA requires its employees, including Osborne, Stone, and Murray, to enter into non-solicitation and confidentiality agreements.

**C.    Osborne's, Stone's, and Murray's Contractual Obligations to MMA Under The Marsh & McLennan Agency LLC Non-Solicitation and Confidentiality Agreement**

28.    Each of Osborne, Stone and Murray executed a Non-Solicitation and Confidentiality Agreement upon commencement of his or her employment with MMA: Osborne on January 31,

2017, Stone on September 30, 2021, and Murray on March 20, 2024. (Osborne's, Stone's, and Murray's Marsh & McLennan Agency LLC Non-Solicitation and Confidentiality Agreements with MMA attached hereto as **Exhibits A**, **B**, and **C**, respectively, are each referred to herein as an MMA Agreement and collectively as the "MMA Agreements.")[2]

29.     In their MMA Agreements, Osborne, Stone, and Murray explicitly acknowledged that MMA "is engaged in a highly competitive business and that its competitive position depends upon its ability to maintain the confidentiality of the Confidential Information and Trade Secrets which were developed, compiled and acquired by [MMA] at its great effort and expense." Exs. A-C at § 5. Osborne, Stone, and Murray each promised to safeguard MMA's Confidential Information while employed by MMA "and for so long thereafter as the pertinent information or documentation remains confidential" and to not "directly or indirectly, use, disseminate or disclose to any other person, organization or entity Confidential Information or Trade Secrets." *Id.*

30.     Osborne, Stone, and Murray also acknowledged in their MMA Agreements that, "solely by reason of [their] employment by [MMA]" (including, for Osborne, "its predecessor, JSL"), they "ha[ve] and will come into contact with and develop and maintain relationships with a significant number of…[MMA's] clients and prospective clients, and will have access to Confidential Information and Trade Secrets relating thereto." *Id.* § 1(a). Accordingly, Osborne, Stone and Murray each agreed that for two years following the separation of their employment with MMA, they would not, directly or indirectly, solicit or service MMA clients or prospective clients "with which…[they]

---

[2] Osborne's MMA Agreement is entitled the "JSL, Marsh & McLennan Agency LLC Company Non-Solicitation and Confidentiality Agreement" because Osborne commenced employment with MMA and entered into the agreement upon MMA's acquisition of J. Smith Lanier & Co. ("JSL"), the brokerage firm at which Osborne was had been employed at the time of MMA's acquisition. The substantive terms of the "JSL, Marsh & McLennan Agency LLC Company Non-Solicitation and Confidentiality Agreement" between Osborne and MMA are identical to MMA's standard Marsh & McLennan Agency LLC Non-Solicitation and Confidentiality Agreement, executed by Stone and Murray.

had contact or about whom…[they] obtained Confidential Information or Trade Secrets during the

last two (2) years of his or her employment with…[MMA]":

> Consequently, Employee covenants and agrees that in the event of
> separation from employment with the Employer, whether such
> separation is voluntary or involuntary, Employee will not, for a
> period of two (2) years following such separation, directly or
> indirectly (i) solicit clients or prospective clients of [MMA] for the
> purpose of selling or providing consulting services or projects, or
> selling products, of the type sold or provided by Employee while he
> or she was employed by…[MMA]; (ii) induce clients or prospective
> clients of …[MMA] to terminate, cancel, not renew, or not place
> business with…[MMA], (iii) perform or supervise the provision or
> performance of services or projects or provision of products of the
> type sold or provided by Employee while he or she was employed by
> [MMA] on behalf of any clients or prospective clients of [MMA], or
> (iv) assist others to do the acts specified in Sections 1(b)(i)-(iii). …
> Employee shall not engage in any subterfuge to circumvent this
> prohibition, including, but not limited to accompanying others on
> calls to the client, contacting the client with other persons,
> supervising other persons in soliciting or serving the client, providing
> Confidential Information and Trade Secrets to others to assist them
> in soliciting or serving the client, participating in developing
> presentations to be made to the client, or other similar activities.

*Id.* at § 1(b). This provision of the MMA Agreements is referred to herein as the "Client Non-

Solicitation Covenant."

31.     Osborne, Stone, and Murry also acknowledged in their MMA Agreements that,

"solely by reason of [their] employment by [MMA], and in light of the broad responsibilities of such

employment which include working with other employees of…[MMA], [they] ha[ve] and will come

into contact with and acquire Confidential Information and Trade Secrets regarding…[MMA's] other

employees." *Id.* at § 2. Accordingly, Osborne, Stone and Murray each agreed that:

> both during employment with…[MMA] and for a period of two (2)
> years thereafter, Employee shall not, either on Employee's own
> account or on behalf of any person, company, corporation, or other
> entity, directly or indirectly, solicit, or endeavor to cause any
> employee of [MMA] with whom Employee, during the last two (2)
> years of his or her employment with…[MMA], came into contact for

the purpose of soliciting or servicing business or about whom
Employee obtained Confidential Information and Trade Secrets to
leave employment with [MMA].

*Id.* This provision of the MMA Agreements is referred to herein as the "Employee Non-Solicitation Covenant."

32.     Osborne, Stone, and Murray further agreed that, upon "immediately upon the[ir] termination of employment" with MMA, they must return to MMA all of its property, including "any originals and all copies of all files, notes, documents, slides…, computer disks, printouts, reports, lists of…[MMA's] clients or leads or referrals to prospective clients, and other media or property in [their] possession or control which contain or pertain to Confidential Information or Trade Secrets," as well as any "computers…and other equipment." *Id.* at § 6.

33.     Osborne, Stone, and Murray further acknowledged and agreed that the restrictive covenants contained in the MMA Agreements were "necessary to protect the legitimate business interests of [MMA] and [were] reasonable in view of the benefits and consideration Employee has received or will receive from [MMA]." Osborne, Stone, and Murray also expressly acknowledged that the restrictions would not prevent them "from obtaining gainful employment in [their] field of expertise or cause [them] undue hardship." *Id.* at § 9.

34.     The aforementioned types of restrictive covenants are common in the insurance brokerage industry. Insurance brokerage firms are aware that employees in the industry are typically subject to agreements with their current employer containing these types of restrictive covenants. Indeed, Alliant requires its employees, including those it poaches from competitors, to sign employment agreements containing nearly identical restrictive covenants. *See, e.g.*, Alliant Employment Agreement at § 9, "Covenants by Employee," attached hereto as **Exhibit D**.

35.     Alliant unquestionably knew that MMA's employees agreed to these restrictive covenants. Putting aside that it is common knowledge in the industry, as part of its standard

recruiting practices, Alliant requires candidates to provide their restrictive covenant agreements with their current employer to Alliant, and Alliant's standard employment agreement requires employees to represent that they have done so. (Ex. D at § 12). Likewise, the MMA Agreements themselves required Osborne, Stone, and Murray to provide copies of the MMA Agreements to any prospective new employer "prior to taking a position with such new employer." *See* Exs. A-C at § 19.

## II.    Alliant's History and Pattern of Intentionally Tortious Conduct

### A.    Alliant Develops a Corporate Growth Strategy Based on Tortiously Raiding Competitors

36.    For approximately the past decade, Alliant has pursued a corporate strategy, which it euphemistically labels its "leveraged hire strategy,"[3] designed to grow its business by taking valuable employees from its competitors, and through them, the client relationships that are the lifeblood of an insurance brokerage business. In other words, rather than invest the time and effort to build a business through superior service or lawful acquisitions, Alliant's growth strategy centers on misappropriating the investment of its competitors. Alliant accomplishes this by luring Producers managing substantial books of business at competing firms to Alliant, and inducing them to bring their former employer's clients, client service personnel, and confidential information with them, in deliberate breach of their common law obligations and the restrictive covenants.

37.    Alliant knows that its *modus operandi* is unlawful. Indeed, as detailed below, Alliant and/or the employees it has recruited have faced a staggering *64 lawsuits*, at least, over these practices, resulting in multiple injunctions and other adverse rulings being entered against Alliant.

---

[3] *See, e.g.*, *Lockton*, No. 2019-0226-JTL, Exhibit 1 to Transmittal Affidavit and Corrected Transmittal Affidavit of Jarrett W. Horowitz in Support of Plaintiffs' Opening Brief in Support of Their Motion for a Preliminary Injunction (Del. Ch. Ct. July 21, 2022) (internal Alliant email referring to producers with existing books of business whom Alliant was recruiting from a competitor firm as "Leveraged Hires").

Alliant's litigation history—and the shocking internal Alliant documents that have become public as a result—reveal Alliant's brazen disregard for fair competition and the law. Alliant's schemes are deliberate, systematic, and follow a well-worn pattern, widely recognized in courts nationwide as the "Playbook," with only minor variations.

38.     First, Alliant identifies a Producer at a competitor who is perceived to be important to client relationships and revenue generation. In initial discussions with the Producer, Alliant investigates the size of the book of business that the Producer manages for the competitor. Alliant then offers the Producer an inflated compensation package—including a cash sign-on bonus and equity in the company—to join Alliant based on the book of business that the Producer manages for the competitor. These inflated compensation packages are expressly contingent on the Producer violating his or her contractual obligations and other duties to his or her employer by leaving without notice, poaching clients, soliciting colleagues to join Alliant in coordinated departures, and participating in the other aspects of Alliant's schemes as described herein. Alliant understands that this "leveraged hire strategy" depends upon the violation of fiduciary and contractual obligations owed by employees to Alliant's competitors. Alliant not only encourages and induces these employees to breach their duties, it assumes responsibility for those breaches by agreeing to indemnify the Producers against any claims that might arise from the execution of this unlawful strategy.

39.     Second, at Alliant's direction, the Producer agrees to withhold from his or her current employer notice of his or her decision to join Alliant. While still employed by a competitor, the Producer operates under the materially false pretense that he or she remains a loyal employee of the competitor, when in fact the Producer is acting in Alliant's interests.

40.     Third, in the period between the decision to join Alliant and leaving his or her employment with an Alliant competitor, the Producer obtains property for Alliant from the

competitor, including client contacts, policy renewal dates, premium amounts, and other Confidential Information.

41.    Fourth, during this same window—after the Producer agrees to join Alliant, but while he or she is still employed by an Alliant competitor—the Producer assists Alliant's recruitment of other employees of the competitor, including members of the competitor's client-service teams, in violation of the employees' common law and contractual obligations and duties. Alliant offers inflated salaries and bonuses precisely tailored to lure away employees from its competitors in part because the Producer often provides Alliant with confidential salary information for those other team members, in violation of his or her contractual and fiduciary obligations.

42.    Fifth, once recruited to join Alliant, client-service team members also operate under the false pretense that they remain loyal employees of their current employer. During this period, they collaborate with the Producer and with each other to misappropriate confidential information for Alliant's benefit. To avoid detection, they use methods designed to obscure their actions, such as printing documents instead of using traceable electronic means. *See Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *16 (Del. Ch. June 20, 2019) ("*Lockton*") (finding "powerful circumstantial evidence" that employees recruited by Alliant printed and misappropriated confidential information in hard copy form, which they "took with them to use at Alliant"; concluding that employee's testimony that he compiled a client contact list from memory after joining Alliant was likely "a lie" and the employee likely had printed the list and removed it in hard copy from his former employer before resigning).

43.    Sixth, Alliant and the employees it recruits from competitors coordinate their resignations to maximize harm to the competitor and the benefits of the raid for Alliant. Knowing its conduct is unlawful and likely to be enjoined, Alliant's primary objective is to transfer as much business as possible from the competitor to Alliant before the competitor can secure an injunction.

14

This creates a race: Alliant's ability to poach clients versus the competitor's ability to obtain legal relief. Alliant tips the scales in its favor by orchestrating resignations to occur "effective immediately," leaving the competitor blindsided, and strategically timing the resignations to provide Alliant with a head start. Rather than scheduling resignations for a Friday afternoon—which would give the competitor "all weekend to prepare litigation strategy before the new hires are able to bring in business"[4]—Alliant schedules resignations for Monday mornings (although it may adjust the timing to exploit specific vulnerabilities in the competitor's leadership),[5] preceded by a weekend of client solicitation, expressly instructing its new hires to "move as much business as possible **within the first 72 hours of…resignation,** before a court order c[an] be entered stopping" them.[6] Once the competitor's clients have transitioned to Alliant, any subsequent court order is of little concern to Alliant, which invokes "customer choice" to argue that an injunction should only prohibit future solicitation, and that it should be allowed to continue servicing the unlawfully obtained clients.[7] Through this calculated interplay of immediate resignations, strategic timing, and aggressive client solicitation, Alliant ensures that it secures the clients, business, and

---

[4] *Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, No. 2019-0226-JTL, Redacted Exhibits 1-7 and 10 to Corrected Transmittal Affidavit of Jarrett Horowitz, Ex. 7 (Del. Ch. Apr. 19, 2022).

[5] *See Lockton*, 2019 WL 2536104, at *16 (Del. Ch. June 20, 2019) (noting that Alliant moved the resignation date from a Monday to a Tuesday coincide with the competitor's leadership being out of town at a corporate retreat).

[6] *AssuredPartners Capital, Inc. v. Alliant Ins. Servs., Inc., Mitchell Adamic, Desiree Brewer*, No. 24-cv-398, Affidavit of Michael Harrington (ECF No. 4-1) at ¶ 10 (W.D. Ky. July 5, 2024) (emphasis in original); *see also Lockton*, No. 2019-0226-JTL, Exhibits 11, 14-16, 43, 48-50, 54, 59-60, 62-65, 67-69, 73-75, 77, 80-82 and 86 to the Transmittal Affidavit of Jarrett Horowitz, Ex. 15 (Del. Ch. Ct. Apr. 27, 2022) (group text message from Alliant executive to new hires from a competitor congratulating them on having "established a business in 3 ½ days" and exhorting them to "Let's keep going!!!!!"); *id.* at Ex. 16 (group text message from another Alliant executive to the same group of new hires from a competitor "[t]hank[] them for "helping establish a new office in 3 ½ days" and urging them "Go go go. Call everyone")."

[7] *See Lockton*, 2019 WL 2536104, at *23 (Del. Ch. June 20, 2019).

confidential information it seeks—knowing that by the time legal consequences arise, the damage will already have been done.

44.     Seventh, Alliant attempts to conceal—in some instances successfully—its unlawful conduct, with its concealment efforts continuing even into legal proceedings after it is sued. The lengths to which Alliant and its regular outside counsel go to conceal Alliant's intentionally unlawful conduct were laid bare in *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104 (Del. Ch. June 20, 2019), where a privilege waiver allowed the plaintiff and the Court to peel back the curtain on Alliant's scheme. In particular, the conduct of Alliant's regular outside counsel revealed by the "privileged" communications was so egregious that the court concluded that the ***crime-fraud exception*** to attorney-client privilege likely applied to the communications of Alliant's regular outside counsel. *Id.* at n.6.[8]

45.     One of the methods that Alliant uses to conceal its unlawful conduct in litigation is to wrongfully withhold documents under baseless claims of attorney-client privilege.[9] As a matter of standard practice, Alliant employees label emails as "privileged" even when the emails do not pertain to legal advice—either sought or provided. Alliant instructs its employees to copy attorneys on communications between and among non-lawyers when the substance of the communications neither seeks nor conveys legal advice. Alliant then routinely withholds these communications from discovery as "privileged."

---

[8] Even after the *Lockton* litigation was resolved, Alliant fought vigorously to conceal the details of its unlawful conduct and the significant role of its outside counsel. It sought to maintain the details of the court record under seal and hidden behind overly broad and improper redactions— an effort that was rejected by the Chancery Court. The court found that "Alliant has no right to shield tortious strategies from public review," and that "[i]t may be embarrassing for Alliant to have the specifics of its conduct brought to light. But embarrassment is not grounds for confidential treatment." *See* **Exhibit E**, at ¶¶ 14(c), 19.

[9] *See, e.g.*, *Lockton*, 2019 WL 2536104, at *10 n.6 & *18 (Del. Ch. June 20, 2019) (noting the "apparent efforts by counsel [for Alliant] to conceal evidence…through a facially inadequate privilege log").

46.    To conceal the breach of contractual and fiduciary duties as well as the theft of confidential information from Alliant's competitors, Alliant's attorneys also draft affidavits for the former employees of the competitors that contain false representations that the employees complied with their contractual and fiduciary duties. *See, e.g.*, *Lockton*, 2019 WL 2536104, at *2, *15, *20, & n.11-12, n.16 (describing Alliant's affidavits as "problematic" and "difficult to stomach" "lawyer-drafted submissions," which "made expansive, absolutist representations about the absence of any solicitation efforts, which discovery revealed to be inaccurate," and citing Alliant's submission of "inaccurate affidavits to [the] court" as one form of "improper means" that Alliant used to interfere with its competitor's contracts).

47.    Alliant's regular outside counsel has also concocted sham protocols and processes for Alliant to deploy, namely a "Prospective Employee Departure Protocol" ("PEDP") and a "remediation program," for the purpose of deceiving competitors and courts and concealing Alliant's unlawful conduct.[10]

48.    The PEDP is designed to deceive competitors by making it appear that Alliant instructed former employees of competitors to abide by contractual and other obligations to the competitors. In fact, Alliant's unlawful schemes depend on violations of contractual and other obligations that are owed to its competitors, and Alliant anticipates, encourages, and rewards the violations. Repeated, flagrant violations of the PEDP by former employees of Alliant's competitors are not met with any admonishment or discipline from Alliant. To the contrary, the employees are rewarded and indemnified by Alliant. The PEDP is consistently used as a tool in litigation to defend against claims from Alliant's competitors.

---

[10] *See, e.g.*, *Lockton*, 2019 WL 2536104, at *16, *22 (Del. Ch. June 20, 2019).

49.     The sham "remediation program" was designed to conceal the use of confidential information that was stolen from Alliant's competitors for use at Alliant. Through the façade of the "remediation program," Alliant insists that all misappropriated documents have been identified and returned to its competitors or destroyed. In reality, of course, those documents are stolen and used by Alliant to solicit clients—thereby damaging competitors by causing loss of client relationships and revenue—well before the identified documents are purportedly "remediated." Furthermore, "remediating" a document does nothing when that document and its contents have already been printed, copied, or otherwise disseminated to Alliant personnel.

50.     Alliant also uses the façade of the "remediation program" to resist attempts by competitors to discover for themselves what documents were taken and used by former employees. For example, Alliant routinely refuses to comply with requests for independent analysis of the departing employees' personal devices, claiming that such analysis is unnecessary and would violate a purported "privilege" covering the remediation process.

51.     Alliant, including through its outside counsel, directs those involved in the unlawful schemes to avoid creating or retaining evidence of their unlawful conduct, including by urging Alliant employees and former employees of Alliant's competitors not to communicate about their breaches of contractual and fiduciary duties in writing. For example, in *Lockton*, the court found that Alliant had coordinated one of its hallmark raids by instructing a group of Lockton employees to resign at the same time and without notice, in violation of the employees' contractual notice requirements, and "[t]o conceal this instruction, Alliant's outside counsel told [the Alliant executive coordinating the raid] to pass it along verbally rather than putting it in writing." *Lockton*, 2019 WL 2536104, at *7. Indeed, in an email to Alliant executives, Alliant's outside counsel bluntly stated: "[W]e are no longer instructing employees in writing to resign without notice because they may have notice provisions –

Alliant will instead instruct them verbally."[11] In other words, this directive was not aimed at preventing unlawful conduct, but at concealing it. Knowing that such instructions would cause the employees to breach their contracts, the solution advised by Alliant's counsel was not to refrain from giving the instruction, but to ensure that no record of it existed—thereby preserving the ability to lie about having done so in the future.

52.    Alliant and its regular outside counsel have even directed the destruction of documents to conceal unlawful conduct. *See, e.g.*, *id.* at *20 ("Alliant also took independently wrongful steps such as directing [a departing Producer] to destroy evidence"). Indeed, *Lockton* court found that "Alliant engaged in extensive efforts to avoid creating an evidentiary record of its activities, which cross the line on important occasions into the actual destruction of evidence." *See id.* at *17. In another stunning statement, Alliant's outside counsel advised Alliant executives to destroy incriminating documents, and, while disappointed that a paper trail of Alliant's intentionally wrongful conduct had been created despite counsel's instructions to conduct unlawful activity through untraceable means, called the deletion of the incriminating email evidence "a start."[12]

## C.    Alliant's Unlawful Conduct Continues Even After a Multitude of Lawsuits

53.    As Alliant anticipated, the execution of its unlawful growth strategy has resulted in an avalanche of lawsuits against it. Lawsuits against Alliant by competitors that have been victimized by Alliant's strategy including the following, among others:

54.    *Willis Towers Watson Midwest, Inc. v. Miller and Alliant Ins. Servs., Inc.*, No. 24-cv-02539 (D. Kan. Nov. 21, 2024); *Willis Towers Watson Northeast, Inc. v. Scott Davis, Erin*

---

[11] *Lockton*, No. 2019-0226-JTL, Exhibits 11, 14-16, 43, 48-50, 54, 59-60, 62-65, 67-69, 73-75, 77, 80-82 and 86 to the Transmittal Affidavit of Jarrett Horowitz, Ex. 14 at ALLIANT00090188 (Del. Ch. Ct. Apr. 27, 2022).
[12] *Lockton*, No. 2019-0226-JTL, Exhibits 11, 14-16, 43, 48-50, 54, 59-60, 62-65, 67-69, 73-75, 77, 80-82 and 86 to the Transmittal Affidavit of Jarrett Horowitz, Ex. 54 (Del. Ch. Ct. Apr. 27, 2022).

*Schwamb, and Alliant Ins. Servs., Inc.*, No. 24-cv-01816 (D. Conn. Nov. 19, 2024); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398 (W.D. Ky. July 5, 2024) (including counterclaims *AssuredPartners Capital, Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *NFP Corporate Services (SE), Inc. v. Starkey*, No. 24-cv-00796 (D. Del. June 25, 2024); *NFP Property & Casualty Services, Inc. v. Alliant Ins. Servs., Inc.*, No. 24-cv-00789 (C.D. Ca. Apr. 10, 2024); *The Texas Series of Lockton Companies, LLC v. Alliant Ins. Servs., Inc. and Post*, No. 2024-11651 (Tex. Dist. Ct. Feb 23, 2024); *USI Ins. Servs. LLC v. Louis Spina and Alliant Ins. Servs., Inc.*, No. 70777/2023 (N.Y. Sup. Court Nov. 14, 2023); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc*., No. 23-cv-659 (E.D. Va. Oct. 12, 2023); *Lockton Companies, LLC Pacific Series and Lockton Partners, LLC v. Alliant Ins. Servs., Inc., Barnes, Racunas, and Roderick*, No. 23-cv-00705 (W.D. Mo. Oct. 3, 2023); *Assured Partners of South Carolina, LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751 (D.S.C. Sept. 22, 2023); *Woodruff-Sawyer & Co. v. Pelissier, Alliant Ins. Servs., Inc., and Does 1-5*, No. 30-2023-01336213 (Cal. Sup. Ct. July 13, 2023); *Aon plc, et al. v. Alliant Ins. Servs., Inc.*, 23-cv-03044 (N.D. Ill. May 15, 2023); *Armfield Harrison & Thomas, LLP and BRP Colleague, Inc. v. King and Alliant Ins. Servs., Inc.*, No. 23-cv-666 (W.D. Wash. May 8, 2023); *USI Ins. Servs. LLC v. Alliant Ins. Servs., Inc.*, No. 23-cv-00192 (D. Ariz. Jan. 30, 2023); *Lockton Companies, LLC - Pac. Series v. Giblin*, No. 22-CV-00791, (W.D. Mo. Nov. 30, 2022); *McGriff Insurance Services, Inc., f/k/a BB&T Ins. Servs., Inc. v. Suplick, Fox, Cook, Gibson, and Alliant Ins. Servs., Inc*., No. 2022-CA-008660-O, (Fla. Cir. Ct. Sept. 19, 2022); *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc.*, 22-cv-03931 (N.D. Ill. July 28, 2022); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc., Thomas, Bennett, and Gullet*, No. 22-cv-277 (W.D.N.C. June 21, 2022); *McGriff Insurance Inc. v. Madigan, Gramling, Linde, and Alliant Ins. Servs., Inc*., No. 22-cv-05080 (W.D. Ark. Apr. 26, 2022); *Aon plc, Aon Group, Inc., Aon Corp., and Aon Risk Services Companies, Inc. v. Alliant Ins. Servs., Inc., Johnson,*

*Stites, Barlow, Doerfler, Kunstler, and Chan*, No. 21-cv-06871 (N.D. Ill. Dec. 27, 2021); *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc., Bixby, Hinckley, Leavitt, Pester, and Rogers*, No. 2184CV2828 (Mass. Sup. Ct. Dec. 10, 2021); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.*, 21-cv-00417 (W.D.N.C. Aug. 12, 2021); *Kibble & Prentice Holding Co. d/b/a USI Ins. Servs. Northwest v. Anderson and Alliant Ins. Servs., Inc.*, No. 82-CV-21-619 (Minn. Dist. Ct. Feb. 19, 2021); *Kibble & Prentice Holding Co., d/b/a USI Ins. Servs. Northwest v. Tilleman and Alliant Ins. Servs., Inc.*, No. 21-cv-00083 (D. Idaho Feb. 18, 2021); *AssuredPartners Northeast, LLC v. Stone and Alliant Ins. Servs., Inc.*, 20-cv-05564 (E.D.N.Y Nov. 16, 2020); *The Partners Group, LTD v. Bonville and Alliant Ins. Servs., Inc.,* No. 20CV34115 (Or. Cir. Ct. Oct. 6, 2020); *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc. and Stone Point Capital*, No. 2020-0780 (Del. Ch. Sept. 14, 2020); *Arthur J. Gallagher & Co. v. Pierce, Albrecht, Conway, Lambourne, Ruemke, Veltman, Burke, Thalachelloor, and Alliant Ins. Servs., Inc.*, No. 47103886-2020 (Tex. Dist. Cit. Aug. 13, 2020); *Arthur J. Gallagher & Co. v. Tarantino, Heater, Machette, Brush, and Alliant Ins. Servs., Inc.*, No. 20-cv-05505 (N.D. Cal.) (Aug. 7, 2020); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159 (W.D. Pa. Aug. 3, 2020); *Gallagher Benefit Services, Inc. v. Ghirardi and Alliant Ins. Servs., Inc.*, No. 50-2020-CA-004646-MB (Fl. Cir. Ct. Apr. 24, 2020); *Assured Partners of Washington, LLC v. Acarregui and Alliant Ins. Servs., Inc.*, No. 20-cv-00290 (W.D. Wash. Feb. 24, 2020); *Marsh USA Inc. v. Vaught, Snelgrove, Dowling, Shahidi, Lu, Turney, Nguyen, and Alliant Ins. Servs., Inc.*, No. 651024/2020 (N.Y. Sup. Ct. Feb. 14, 2020); *Aon Risk Services Co. v. Alliant Ins. Servs., Inc., Brusek, Janic Lubas, Ross, Taylor, Vick, and Walsh*, No. 19-cv-07312 (N.D. Ill. Nov. 5, 2019); *USI Ins. Servs. LLC and USI Advantage Corp. v. Banahan and Alliant Ins. Servs., Inc.*, No. 68183/2019 (N.Y. Sup. Ct. Nov. 1, 2019); *JLT Specialty Ins. Servs. Inc. v. Riccio, Walsh, Carroll, Decatur, Franzese, Leto, and Alliant Ins. Servs., Inc.*, No. 652659/2019 (N.Y. Sup. Ct. May 6, 2019); *Mt. W. Series of Lockton Cos., LLC and Lockton Partners, LLC v. Alliant Ins. Servs.,*

*Inc.*, 2019-0226-JTL (Del. Ch. Mar. 22, 2019); *Arthur J. Gallagher & Co. v. Kuntz and Alliant Ins. Servs., Inc.*, No. GD-19-02440 (Pa. Ct. Common Pl. Feb. 8, 2019); *NFP Corp. and Maschino, Hudelson & Associates, L.L.C. v. Ayala, Alliant Ins. Services, Inc. and C.L. Scott Corporate Ins. Services, Inc.*, 2018-0688 (Del. Ch. Sept. 18, 2018); *Corp. Synergies Grp., LLC v. Andrews, Ur, Duffy, and Alliant Ins. Servs., Inc.*, No. 18-cv-13381 (D.N.J. Aug. 30, 2018); *Marsh USA, Inc. v. Moody, Young, Beacham, O'Connell, and Alliant Ins. Servs., Inc.*, No. 17-651325 (N.Y. Sup. Ct. Aug. 7, 2018); *Willis Ins. Servs. of Ga. v. Alliant Ins. Servs., Inc.*, No. 18-cv-1826 (M.D. Fla. July 25, 2018); *Willis Ins. Servs. of Ga. v. Alliant Ins. Servs., Inc.*, No. 2018cv308132 (Ga. Super. Ct. July 23, 2018); *Willis of Minn. v. Alliant Ins. Servs., Inc.*, No. 27-cv-18-11684 (Minn. Dist. Ct. July 20, 2018); *Arthur J. Gallagher & Co. v. Long and Alliant Ins. Servs., Inc.*, No. 17-cv-12313 (D. Mass. Dec. 13, 2017); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520 (S.D.N.Y. December 5, 2017); *USI Ins. Servs., LLC, f/d/b/a Key Ins. & Benefits, Inc. v. Zukus and Alliant Ins. Servs., Inc.*, No. 2018-12953 (Pa. Ct. Common Pl. May 15, 2018); *Arthur J. Gallagher & Co. v. Long and Alliant Ins. Servs., Inc.*, No. 17-cv-12313 (D. Mass. Dec. 13, 2017); *USI Ins. Servs. Nat., Inc. v. Grassi.*, 2017-CA-009742-O (Fla. Cir. Ct. Nov. 3, 2017); *USI, Inc. v. Call v. Alliant Ins. Servs., Inc.*, No. BC678226 (Cal. Super. Ct. Oct. 2, 2017); *Cook Maran & Assocs., Inc. v. Scrocca and Alliant Ins. Servs., Inc.*, No. C-209-17 (N.J. Super. Ct., Sept. 13, 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Alliant Ins. Servs., Inc.*, No. 2017-0540 (Del. Ch. July 26, 2017); *Ralph Weiner & Assocs., LLC v. Hancock*, No. 2017-CH-06618 (Ill. Cir. Ct. May 9, 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Laman*, No. 502016CA00904MB (Fla. Cir. Ct. April 10, 2017); *The Graham Co. v. Harper, Algeo, Alliant Ins. Servs., Inc.*, No. 170202712 (Pa. Ct. Common Pl. Feb. 9, 2017); *Willis of Mass. v. Feinberg and Alliant Ins. Servs.*, No. 1684CV01497 (Mass. Super. Ct. Oct. 3, 2016); *The Hays Group, Inc. v. Peters and Alliant Ins. Servs., Inc.*, No. 0:16-cv-2352 (D. Minn. Oct. 12, 2016); *Willis of Fla. v. Powell, Bolden, and Alliant Ins. Servs., Inc.*, No. 2016-CA-007824 (Fla. Cir. Ct. Aug.

16, 2016); *Aon PLC v. Heffernen and Alliant Ins. Servs., Inc.*, No. 16-cv-1924 (N.D. Ill. Feb. 2, 2016); *Smith Bros. Ins. LLC v. Ellenberg-Gray*, No. CV-15-6060903-S (Conn. Super. Ct. Dec. 7, 2015); *Aon Corp. v. Alliant Ins. Servs. Inc.*, No. 14-650700 (N.Y. Sup. Ct. June 26, 2014); *Regions Ins., Inc. v. Alliant Ins. Servs., Inc.*, No. 13-cv-00667 (S.D. Miss. Oct. 25, 2013); *Anco Ins. Servs. of Houston v. Barnard*, No. 2011-29054 (Tex. Dist. Ct. Feb. 22, 2012); *Aon Risk Servs. v. Cusack and Alliant Ins. Servs., Inc.*, No. 651673/2011 (N.Y. Sup. Ct. 2011).[13]

55.     Courts have enjoined Alliant's unlawful behavior or otherwise ruled against Alliant in at least the following matters: *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398 (W.D. Ky. July 5, 2024) (including counterclaims *AssuredPartners Capital, Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *USI Ins. Servs. LLC v. Louis Spina and Alliant Ins. Servs., Inc.*, No. 70777/2023 (N.Y. Sup. Court Nov. 14, 2023); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc*., No. 23-cv-659 (E.D. Va. Oct. 12, 2023); *Assured Partners of South Carolina, LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751 (D.S.C. Sept. 22, 2023); *Lockton Companies, LLC - Pac. Series v. Giblin*, No. 22-CV-00791, (W.D. Mo. Nov. 30, 2022); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc., Thomas, Bennett, and Gullet*, No. 22-cv-277 (W.D.N.C. June 21, 2022); *Kibble & Prentice Holding Co. d/b/a USI Ins. Servs. Northwest v. Anderson and Alliant Ins. Servs., Inc.*, No. 82-CV-21-619 (Minn. Dist. Ct. Feb. 19, 2021); *Kibble & Prentice Holding Co., d/b/a USI Ins. Servs. Northwest v. Tilleman and Alliant Ins. Servs., Inc*., No. 21-cv-00083 (D. Idaho Feb. 18, 2021); *AssuredPartners Northeast, LLC v. Stone and Alliant Ins. Servs., Inc.*, 20-cv-05564 (E.D.N.Y Nov. 16, 2020); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159 (W.D. Pa. Aug. 3, 2020); *Assured Partners of*

---

[13] In 2022, in unsealing the internal Alliant documents that had been revealed in discovery in the *Lockton* litigation, the Delaware Chancery Court noted that "Alliant faces at least forty-one lawsuits in at least twenty-five jurisdictions in which competitors have asserted similar claims" related to Alliant's strategy, and documents revealed in that litigation "provide insight into Alliant's *modus operandi.*" *See* Ex. D, at ¶ 20(a).

*Washington, LLC v. Acarregui and Alliant Ins. Servs., Inc.*, No. 20-cv-00290 (W.D. Wash. Feb. 24, 2020); *Aon Risk Services Co. v. Alliant Ins. Servs., Inc., Brusek, Janic Lubas, Ross, Taylor, Vick, and Walsh*, No. 19-cv-07312 (N.D. Ill. Nov. 5, 2019); *Mt. W. Series of Lockton Cos., LLC and Lockton Partners, LLC v. Alliant Ins. Servs., Inc.*, 2019-0226-JTL (Del. Ch. Mar. 22, 2019); *Corp. Synergies Grp., LLC v. Andrews, Ur, Duffy, and Alliant Ins. Servs., Inc.*, No. 18-cv-13381 (D.N.J. Aug. 30, 2018); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520 (S.D.N.Y. December 5, 2017); *USI Ins. Servs. Nat., Inc. v. Grassi.*, 2017-CA-009742-O (Fla. Cir. Ct. Nov. 3, 2017); *Cook Maran & Assocs., Inc. v. Scrocca and Alliant Ins. Servs., Inc.*, No. C-209-17 (N.J. Super. Ct., Sept. 13, 2017); *Willis of Fla. v. Powell, Bolden, and Alliant Ins. Servs., Inc.*, No. 2016-CA-007824 (Fla. Cir. Ct. Aug. 16, 2016); *Aon PLC v. Heffernen and Alliant Ins. Servs., Inc.*, No. 16-cv-1924 (N.D. Ill. Feb. 2, 2016); *Aon Corp. v. Alliant Ins. Servs. Inc.*, No. 14-650700 (N.Y. Sup. Ct. June 26, 2014); *Anco Ins. Servs. of Houston v. Barnard*, No. 2011-29054 (Tex. Dist. Ct. Feb. 22, 2012); *Aon Risk Servs. v. Cusack and Alliant Ins. Servs., Inc.*, No. 651673/2011 (N.Y. Sup. Ct. 2011).

56.    Alliant's unlawful conduct is ongoing and is likely to continue despite numerous lawsuits, injunctions, and even sanctions orders, because Alliant has determined that the costs associated with defending and resolving these lawsuits are lower and the benefits to Alliant's revenues and bottom line are greater than could be achieved through lawful competition. Alliant tracks and reports this economic analysis of the benefits of its illegal "leveraged hire strategy" at the highest levels of the company, including Alliant's success in improperly transferring to Alliant its competitors' client relationships, in reports to its Board of Directors, which continues to approve the implementation of these schemes.[14]

---

[14] *See, e.g.*, *Aon Risk Servs. v. Cusak*, 946 N.Y.S.2d 65, at *5-6 (N.Y. Sup. Ct. 2011).

**D.    Alliant's Raid on MMA's Huntsville, Alabama Office**

57.    By 2024, Osborne managed a book of business for MMA that generated approximately $1.6 million in annual revenue. Stone and Murray handled the day-to-day servicing for many of the clients for which Osborne was responsible, including the largest and most profitable accounts within his book of business.

58.    The substantial size and value of Osborne's book of business made him a prime target for recruitment by Alliant. *See Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc. and Stone Point Capital, LLC*, No. 2020-0780, Verified Complaint at ¶ 87 (Del. Ch. Sept. 14, 2020) (describing statement by Alliant recruiter that Alliant targets producers at competitors managing books of business, "on the low end, between $700,000 and $1 million").

59.    On information and belief, Alliant's recruitment of Osborne began by no later than early October 2024—unbeknownst to MMA at that time.

60.    On Saturday, October 5, 2024, Osborne made a rare weekend visit to MMA's office, accompanied by his wife, ostensibly to move the contents of his office into MMA's newly renovated space in the same building. Osborne's manager and MMA's local leader in Huntsville, Alabama, was also present that day, relocating his own office. Osborne completed his move about an hour before the manager finished his; the manager noted that Osborne and his wife lingered in the office with no apparent purpose, seemingly waiting for something. They were. At 11:20 a.m., just after Osborne's manager left, Osborne used the office Xerox machine to scan a hard copy of his MMA Agreement into a PDF, which was automatically sent to his MMA email. Osborne then forwarded the document to his personal Yahoo email account.

61.    There was no legitimate MMA business reason for Osborne to scan his restrictive covenant agreement on that date, particularly since the nearly seven-year-old document was already in his possession. The only plausible explanation is that Alliant had requested the agreement during

its recruitment process. Osborne likely chose to scan the document over the weekend to avoid detection, deliberately waiting until his manager had left to ensure privacy. This conduct aligns with Alliant's well-documented raiding playbook, which requires recruits to provide their restrictive covenant agreements during the recruitment process as part of Alliant's sham compliance measures.[15] Osborne's actions strongly suggest that his discussions with Alliant were already underway, and that Alliant had directed him to secure and deliver his MMA Agreement promptly.

62.     On Monday, October 7, 2024—the first business day after scanning and emailing himself a copy of his MMA Agreement—Osborne instructed his client service team to create a spreadsheet containing detailed and confidential information about his entire book of business. In an email with the subject line "Client list," Osborne informed his team that he had "created a new spreadsheet in [his] main shared drive folder" and directed them to "fill it in with client info that you oversee" by October 20, 2024. The spreadsheet, titled "Osborne Client list.xlsx," was structured to include a comprehensive list of every MMA client within the book of business that Osborne managed, with fields for client name, main point of contact (name, email, and phone number), type of policy, insurance carrier, policy number, expiration date, and premium.

63.     Although Osborne presented this task as an effort to "stay organized and on top of our accounts," his directive was highly unusual and entirely unnecessary. There was no legitimate business need for this spreadsheet, as MMA's proprietary client management systems already

---

[15] *See* Ex. D at § 12 (requiring employee to represent that "Employee has provided his employment agreements…with his former employer" to Alliant); *Lockton*, No. 2019-0226-JTL, Public Version of Exhibit 108 to Plaintiffs' Opening Brief in Support of Their Motion for a Preliminary Injunction (Del. Ch. Jun. 29, 2022) (email from Alliant's counsel in response to a prospective hire's request to "strike" the representation in his proposed employment agreement with Alliant that he had provided his employment agreements with his current employer to Alliant, writing: "**NOT OK. WE NEED HIS AGREEMENTS**," and further stating that the Alliant executive managing the raid "**needs to talk to [the prospective hire] ASAP about…providing us with all of his employment agreements, which his counsel is holding and refusing to provide because they think they are confidential**") (emphasis in original)).

contained all the requested information. These systems—commonly referred to in the insurance brokerage industry as client management databases or CRM platforms—are designed to securely store client data and facilitate efficient account management within the firm's control. By relying on these systems, MMA ensured that client information remained organized, up-to-date, and protected, eliminating any need for *ad hoc* compilations like the spreadsheet Osborne created.

64.     The timing and nature of Osborne's actions strongly suggest that the spreadsheet was not intended to benefit MMA, but rather to serve Alliant's recruitment efforts. Alliant's well-documented playbook involves evaluating the revenue potential of a producer's book of business to ensure a lucrative return on its investment. Osborne's spreadsheet provided precisely the information Alliant requires to assess the value of a potential new hire's book of business, strategize its solicitation of MMA's clients, and prioritize clients whose policies were coming up for renewal soon.[16] By circumventing MMA's internal systems and creating a portable, external document, Osborne could bypass some of the controls designed to safeguard MMA's confidential information, by, for example, printing or sending the document outside MMA through email.

65.     This unauthorized compilation of proprietary client data for Alliant's benefit constitutes a clear breach of Osborne's fiduciary duties to MMA. MMA entrusted Osborne with access to its confidential information solely for the purpose of carrying out his duties on behalf of MMA and serving MMA's clients—not to prepare materials for a competitor's benefit. Osborne's actions also violated the confidentiality provisions of his restrictive covenant agreement, which

---

[16] *See AssuredPartners Capital, Inc. v. Alliant Ins. Servs., Inc.*, No. 24-cv-398, Affidavit of Michael Harrington, ECF No. 4-1 at ¶ 8 (W.D. Ky. July 5, 2024) (explaining that as part of the process of being recruited to Alliant, "Alliant's outside counsel asked me to bring a compilation of confidential details of each of my Regions' accounts," including "each type of client, the client's insurance carrier(s), the premium charged each client, and the revenues generated from each such client").

expressly prohibited him from disclosing or using MMA's confidential information for any purpose other than fulfilling his duties for MMA.

66.    By creating and, on information and belief, transferring this spreadsheet to Alliant, Osborne enabled Alliant to execute its predatory strategy of client raiding. Alliant's business model hinges on recruiting producers like Osborne to move entire books of business by exploiting the client relationships and proprietary data cultivated at their prior employers. In the insurance brokerage industry, client loyalty is often tied to personal relationships with producers, and timely, detailed renewal information is critical to retaining business. Osborne's spreadsheet handed Alliant a roadmap to MMA's clients, equipping it with the tools to poach accounts that had been painstakingly developed and serviced under MMA's stewardship.

67.    On information and belief, once Alliant completed its due diligence on the value of Osborne's book of business, consistent with Alliant's playbook, Alliant extended Osborne a lucrative compensation package. This package included a substantial up-front cash signing bonus and equity in the company—and Osborne readily accepted. This generous offer, however, was far from an act of mere professional courtship. To be clear, Alliant's compensation package was not a reward for Osborne's skills or experience, but a calculated investment, explicitly contingent on his ability to deliver MMA's clients to Alliant and proportionate to the amount of MMA business that Osborne represented he would be able to immediately cause to move to Alliant. *See, e.g.*, *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc.*, No. 2020-0780, Verified Complaint at ¶ 86 (Del. Ch. Sept. 14, 2020) (quoting August 24, 2020 email from Alliant recruiter stating: "My client is Alliant Insurance and the comp is based on the size of book you would be able to bring with you"); *see also Huntington Bancshares Inc. v. Burke*, 2020 WL 6364755, at *10 (W.D. Pa. Oct. 29, 2020), *opinion clarified*, 2020 WL 7063418 (W.D. Pa. Nov. 23, 2020) (finding that "[i]n negotiations with [a recruit from a competitor], [Alliant] was clear that [it] expected [recruit] to be able to bring to

Alliant his book of business").[17] By conditioning Osborne's lavish remuneration on his solicitation of MMA's clients—conduct that flagrantly violated his post-employment restrictive covenants with MMA—Alliant knowingly induced Osborne to breach his legal and fiduciary obligations to MMA.

68.     On information and belief, Osborne accepted Alliant's offer in or around October 2024. But rather than notifying MMA that he had committed to working for a direct competitor, Osborne—acting at Alliant's direction and in accordance with its playbook—deliberately concealed his intentions. For the next several months, Osborne continued to present himself as a loyal MMA employee, while secretly coordinating with Alliant and acting in its best interests and to MMA's detriment. At Alliant's direction, Osborne withheld his resignation until Alliant selected a resignation date designed to maximize disruption to MMA's operations and minimize its ability to retain clients. That date, Monday, December 16, 2024, was chosen to ensure that MMA would be especially unable to respond effectively, leaving it most vulnerable to losing its valuable client relationships to Alliant.

69.     This timeline aligns with Alliant's playbook. Alliant routinely delays the resignation of a recruited producer for months to provide ample time for orchestrating the mass poaching of clients and the recruitment of other employees, including other producers and essential service personnel.

70.     On information and belief, Osborne used the time between accepting Alliant's offer and his abrupt resignation on December 16, 2024, to systematically prepare for transferring his entire book of business to Alliant. A key component of this preparation was recruiting the members

---

[17] *Lockton*, No. 2019-0226-JTL, Public Version of Exhibits 35-90 to Plaintiffs' Opening Brief in Support of Their Motion for a Preliminary Injunction (Del. Ch. Ct. Jun. 29, 2022) (email from a then-current Lockton employe to Alliant, stating "I have gone through my book of business" and stating the salary and bonus at Alliant that he thought was justified based on his "book of business").

of his client service team, as retaining them would be critical to reassuring clients that the transition would be seamless and free of service disruptions. This assurance, in turn, was essential to convincing clients to move their business from MMA to Alliant.

71.    As Murray later admitted to MMA, Osborne, while still concealing his intentions from MMA, informed her that he was moving to Alliant. On information and belief, Osborne disclosed his impending move to Stone at or around the same time and asked both Murray and Stone to join him at Alliant. At a minimum, Osborne identified Murray and Stone to Alliant as indispensable members of his client service team, facilitated their contact with Alliant, and provided Alliant with confidential information regarding their roles, compensation, and value to his book of business. Armed with this information, Alliant crafted tailored, highly lucrative offers that successfully enticed Murray and Stone to join its ranks.

72.    Once Osborne, Stone, and Murray had committed to Alliant, Alliant selected December 16, 2024, as the date to execute on its raid. On information and belief, Osborne supplied Alliant with inside knowledge to help choose this date, ensuring his abrupt resignation would put MMA in an extremely difficult position to retain clients and counter Alliant's actions. The timing of December 16, 2024, was strategically advantageous for Alliant for several reasons:

    a)    **A Monday resignation.** December 16, 2024, was a Monday, a day, as discussed above, specifically recommended in Alliant's playbook to maximize the raid's effectiveness. Resigning on a Monday allows the Producer to solicit clients over the preceding weekend without arousing suspicion, ensuring that by the time the resignation occurs, key clients are already committed to Alliant. This approach deprives the competitor of a chance to preemptively address client concerns or take legal action.

    b)    **The pre-holiday period.** December 16, 2024, fell during the final workweek before Christmas, a period when many employees and client representatives are on

vacation, preparing for time off, or overwhelmed with year-end tasks and holiday events. This hectic season increases the likelihood that key personnel at competitors will be distracted, unavailable, or otherwise less able to respond quickly and effectively to a coordinated raid.

c)    **Osborne's manager's absence.** In Osborne's specific case, December 16, 2024, offered an additional tactical advantage: his manager, the local leader of MMA's Huntsville, Alabama operations, was out of town attending a wedding. Osborne knew of his manager's absence from prior conversations and his access to his manager's MMA calendar. By timing his resignation to coincide with his manager's unavailability, Osborne further hampered MMA's ability to mount an immediate and effective response.

73.    On Thursday, December 5, 2024—only six workdays before his planned resignation—Osborne printed two copies of an Excel spreadsheet titled "JVO Master Renewal List.xlsx." As the title suggests, this spreadsheet was created by Osborne ("JVO" being Osborne's initials) and listed each client in the book of business he managed for MMA, along with each type of policy that each client had and the renewal dates of each such policy. Like the "Osborne Client List.xlsx" spreadsheet that Osborne created and directed his team to populate on October 7, 2024, the "JVO Master Renewal List.xlsx" spreadsheet duplicated information already contained in MMA's CRM system.

74.    There was no legitimate business reason for Osborne to replicate or print data on MMA's behalf that was already accessible in MMA's CRM. The only plausible explanation for Osborne creating this spreadsheet was to extract the data into a portable and easily printable format—precisely what Osborne did when he printed two copies on December 5, 2024. Moreover, it was especially unnecessary for Osborne to print this information when he did because not a single client in Osborne's book of business had a policy renewal date between December 5 and December 16, the date Osborne planned to resign. At the time that he printed the document, Osborne therefore

31

knew that he would no longer be employed at MMA when any of the policies were up for renewal. There was certainly no legitimate business need for MMA's benefit for Osborne to track policy renewal dates *after* he was no longer employed by MMA.

75.    In short, there was no valid MMA business justification for Osborne to print renewal information for his book of business on December 5, 2024—let alone twice. The only reasonable inference is that Osborne created and printed the spreadsheet for use after his resignation from MMA, to benefit Alliant. Notably, policy expiration dates are a particularly important piece of confidential information in the insurance brokerage industry, as a competitor armed with that information can time its solicitation efforts to coincide with prospective clients' heightened interest in considering new brokers.

76.    On Saturday, December 14, 2024, in anticipation of his impending Monday morning resignation without notice, Osborne came into MMA's office and systemically emptied his office of all its contents. Arriving shortly after 9:00 a.m., Osborne spent the next hour, while the building was otherwise deserted, removing at least three large boxes and other items from the office, making six trips to his truck. Although Osborne had printed two copies of the "JVO Master Renewal List.xlsx" spreadsheet barely a week earlier, he left neither copy behind. In fact, Osborne did not leave a single piece of paper in his office—not even in the drawers. He also failed to return his MMA-issued laptop, taking it with him instead. The only item left in his office after he departed was his MMA-issued cell phone, which, on information and belief, he had not recently used. Nonetheless, Osborne deliberately left it behind in the drawer of his office, indicating that he was aware of the requirement to return company-issued devices. His failure to return the laptop, in contrast, strongly suggests that Osborne intended to retain it, or at least delay returning it. On information and belief, Osborne failed to return his laptop because he intended to continue to use it for as long as possible, at least until MMA discovered his resignation and demanded it back, to

facilitate his pre-resignation weekend client solicitation blitz and to continue to access and remove (by clandestine, difficult to trace means) confidential and proprietary information for use at Alliant.

77.     Osborne's secretive weekend visit to MMA's office—two days before resigning without notice—has no legitimate explanation. In the normal course, MMA allows departing employees to retrieve personal belongings, either under supervision or by arranging for the items to be shipped to their home. After nearly seven years at MMA, Osborne was fully aware of this policy. His decision to make a rare Saturday trip to the office, while the office was completely deserted, leaves no doubt that his visit was illicit. The only plausible explanation for Osborne's behavior is that he was not removing personal items, which MMA would have readily permitted, but instead misappropriating confidential and proprietary information belonging to MMA. Osborne intended to use this information to benefit Alliant, despite knowing he was prohibited from taking or using such materials. Indeed, *because* he knew he was prohibited from taking or using such materials that he did so in secret, when no one was present to witness or stop him. This deliberate and covert act aligns with Alliant's playbook of exploiting insider access to gain an unfair competitive advantage.

78.     Despite having emptied his office of every trace of his presence by 10:00 a.m. on Saturday morning, Osborne did not notify MMA that he was resigning at any point that day, the next day, or even on Monday morning. Instead, he left MMA to discover his resignation on its own. Given that Osborne knew his manager would be away at a wedding on Monday, December 16, 2024, on information and belief, Osborne deliberately delayed notifying MMA of his resignation, hoping it would go unnoticed until his manager returned on Tuesday. This delay would have given Osborne an additional day to solicit clients and secure their agreements to move to Alliant without interference from MMA.

79.     On the morning of Monday, December 16, 2024, however, the office manager for MMA's Huntsville, Alabama office noticed something unusual. While performing her routine Monday-morning review of the building's weekend surveillance footage, she observed Osborne making multiple trips to and from the office on Saturday morning, carrying large boxes and other items to his truck. Curious, the office manager went upstairs to Osborne's office and discovered it was completely empty—not a single document, pen, or personal belonging remained. Even the white board on which he typically had client lists and notes had been wiped clean.

80.     Alarmed by the discovery, the office manager texted Osborne's manager to ask if Osborne had resigned. Surprised by the question, the manager called the office manager to confirm what had happened. Upon learning the details, he immediately called Osborne to confront him. Osborne admitted he was resigning to join Alliant, but only after being directly questioned.

81.     Osborne's delayed notification was not accidental—it was a calculated move to maximize his head start in soliciting clients. By waiting until MMA discovered his resignation on its own, Osborne ensured that by the time MMA could take steps to protect its business, he had already begun contacting clients and persuading them to transition their accounts to Alliant. This tactic reflects Alliant's playbook of leveraging stealth and strategic timing to cripple competitors and secure client relationships before its competitors can respond.

82.     Although Osborne's manager had been scheduled to be out of town that day, unforeseen personal circumstances required him to return a day early. Accordingly, he quickly arranged to meet Osborne at a public location near Osborne's home within 20 minutes to discuss Osborne's resignation.

83.     During their meeting, Osborne revealed that Alliant had made him a "life-changing" compensation offer, which included a substantial cash sign-on bonus and equity in the company. This offer is emblematic of Alliant's raiding playbook, which relies on above-market compensation

packages and promises of equity stakes that, according to Alliant, will exponentially increase in value when its private equity sponsor exits the investment, to entice recruits to breach their contractual and fiduciary obligations and otherwise secure its recruits' participation in Alliant's fraudulent and tortious schemes.

84.     Osborne's manager, having been informed by the office manager that Osborne's office was empty but for Osborne's MMA-issued cell phone, asked Osborne where his MMA-issued laptop was. Osborne said it was at home. Osborne's manager asked why he had not brought it with him to return. Osborne claimed that he had been "rushing" to make it to their meeting on time. This explanation was nonsensical, as the meeting location was down the street from Osborne's home, no more than a two-minute drive, and Osborne had had 20 minutes to arrive there. Moreover, grabbing a laptop as one leaves one's home is hardly a time-consuming process that would have made Osborne late or materially changed his arrival time, no matter how far away the meeting spot. Concerned about Osborne having continued access to MMA's confidential and proprietary information through his MMA-issued laptop now that Osborne had agreed to join Alliant, Osborne's manager instructed Osborne to go home and retrieve his laptop and bring it back to him then.

85.     While Osborne drove home to retrieve his MMA-issued laptop, his manager called Murray. She confirmed that Osborne had previously informed her that he was moving to Alliant, and she admitted that she too had agreed to join Alliant and was resigning from MMA.

86.     While home retrieving his laptop, Osborne emailed his manager a resignation notice, stating: "This will confirm what I told you on the phone regarding my resignation from MMA effective immediately."

87.     The next day, December 17, 2024, the manager met with Murray. Hoping to retain her, the manger offered her a substantial raise, effective immediately, even though Murray had only

joined MMA four months earlier. Murray declined, suggesting that Alliant's offer was even more lavish. Shortly thereafter, Murray emailed her manager a written confirmation of her resignation, stating: "Please accept this email as acknowledgement of my resignation."

88.    The manager also spoke with Stone on December 16 and 17, 2024. Stone likewise admitted she was planning to join Osborne at Alliant. Like Murray, Stone also sent her manager an email after their discussion formally acknowledging her resignation.

89.    Later that same day, however, Stone and Murray both abruptly reversed course. They stated that they had not yet received formal offers from Alliant and asked whether they were still employed or had been terminated.

90.    This behavior aligns with Alliant's well-documented strategy of orchestrating staged transitions. Typically, the producer resigns first, while service staff delay their departures under the guise of responding to job postings Alliant places online. These postings and sham interviews are designed to obscure evidence of solicitation by the Producer and to circumvent the Producer's fiduciary duties and restrictive covenants prohibiting co-worker solicitation.[18] Murray and Stone initially followed the playbook but appeared to have drawn Alliant's ire by prematurely admitting their plans to resign. As Alliant's regular outside counsel stated in connection with another raid, "*we don't want any of these folks resigning earlier than intended*."[19]

91.    On information and belief, Stone and Murray are either currently employed by Alliant, or they will be soon. To the extent that they are not currently employed by Alliant, that is

---

[18] *Lockton*, 2019 WL 2536104, at *18 ("In yet another example of subterfuge, an Alliant witness testified that Alliant hired each of the Former Employees after a legitimate application and interview process, in which each Former Employee came in independently, identified a job opening on Alliant's website, and interviewed for the job….The contemporaneous documents indicate that this 'process' was a sham that Alliant and its counsel created for purposes of litigation.").

[19] *Lockton*, No. 2019-0226-JTL, Redacted Exhibits 1-7 and 10 to Corrected Transmittal Affidavit of Jarrett Horowitz, Ex. 7 (Del. Ch. Apr. 19, 2022) (emphasis in original).

for appearance-purposes only, to deceive MMA and any reviewing court into believing the fiction that Osborne did not solicit his colleagues to join him at Alliant.

92.    On December 17, 2024—the day after Osborne's resignation—at least five MMA clients notified their insurance carriers of their intention to move their business to Alliant to follow Osborne. By the end of the business week, a staggering 29 clients had made the switch, and by Monday, December 23, 2024, the total number of lost clients had risen to 30. Such rapid turnover, particularly the moves on December 17, would have been impossible without Osborne's solicitation while still on MMA's payroll. Osborne's pre-resignation efforts to poach clients are the only plausible explanation for this extraordinary and immediate client migration.

93.    As of the date of the filing of this Complaint, Monday, December 23, 2024, MMA is continuing to receive notifications that its clients have switched their business to Alliant. On information and belief, Osborne, now employed at Alliant, is continuing to solicit MMA clients to move their business from MMA to Alliant, with the goal of convincing all the clients within his book of business at MMA to make the switch. After all, that is why Alliant hired him and was willing to make him a "life changing" compensation offer.

94.    On information and belief, Osborne is also providing services to the MMA clients that have switched their business to Alliant.

95.    On information and belief, to the extent that Stone and Murray have commenced their employment at Alliant, Stone and Murray are currently servicing MMA clients that have switched their business to Alliant. To the extent that that Stone and Murray have not yet commenced employment at Alliant, Alliant, Stone, and Murray intend to have Stone and Murray provide services to former MMA clients once they do commence employment at Alliant. Indeed, the only reason Alliant hired Stone and Murray was to service the same clients that they had serviced at MMA, and the only reason Alliant offered them such above-market compensation packages was to

induce them to breach their restrictive covenants, including their non-servicing restriction, and otherwise participate in Alliant's unlawful schemes.

### INJUNCTIVE RELIEF IS NEEDED

96.    As detailed above, Alliant and its co-conspirators devised and executed a brazen scheme aimed at harming competitors across the country, including MMA. The number of lawsuits against Alliant based on identical, repetitive, anti-competitive schemes, is astonishing, and numerous courts have enjoined Alliant due to its unlawful conduct. Alliant's strategy is no secret— it targets a competitor and strikes in a coordinated fashion with its co-conspirators to steal as much business as possible before a court intervenes.

97.    Alliant and its co-conspirators have determined that the return on investment from this unlawful conduct outweighs any costs associated with defending and resolving lawsuits brought by its competitors, including MMA, and the financial and competitive benefits to Alliant are greater than what Alliant would receive through a formal acquisition or legitimate competition. This strategy is overseen and implemented at the highest levels of Alliant, including its Board of Directors, high-ranking executives, and its regular outside counsel. Alliant's unlawful conduct follows a pattern, and it puts the lie to Alliant's representations that it must be a coincidence that employees of its competitors resign simultaneously and show up at Alliant on the same day to immediately work with Alliant to misuse confidential information to solicit and thereafter service their former employer's clients.

98.    MMA is not hypothesizing about Alliant's "leveraged hire strategy." Alliant's litigation history and the public record demonstrate that Alliant's strategy is designed and implemented with litigation in mind. Alliant knows that it is engaging in conduct that will lead to litigation, and that is exactly what has happened for years. Moreover, Alliant understands that it will substantially profit from stealing employees and clients, which it does without hesitation

because the profit generated from its "leveraged hire strategy" covers any litigation costs and allows Alliant to "outspend" its competitors.

99.    The unsealed and unredacted *Lockton* documents confirm this strategy and demonstrate that Alliant's regular outside counsel plays a significant role. In connection with the raid of Lockton, Alliant's outside counsel told an Alliant executive that "[i]f you could encourage the producers to move this along with their lawyers so we can focus on helping them with potential litigation – work we are doing for their benefit – I would appreciate it." Two days later, as discussed above, Alliant's regular outside counsel emailed the same Alliant executive and Alliant's CFO requesting that they

> [p]lease confirm we are telling the new hires to resign on Monday morning (March 11), as opposed to Friday afternoon (March 8). *If the resignations happen Friday, Lockton will have all weekend to prepare litigation strategy before the new hires are able to bring in business....* Please confirm one of you is going to call each of the new hires to tell them when to resign. *Kinder's attorney informed me that Kinder was under the impression he would be resigning on Friday, and we don't want any of these folks resigning earlier than intended.*[20]

In response, the CFO stated that "[t]he transition date is definitely 3/11. I will ask [the other Alliant executive] to remind them when he speaks with each of them next. Also, one of us will be calling each of them prior to 3/11 to let them know what time to arrive and our office address."

100.    The documents detailed above from Alliant's outside counsel establish that Alliant strategically identifies when it wants to raid a competitor, in part because it does not want to afford its competitors time to prepare for litigation so that Alliant has time to steal the business. Indeed, Alliant strikes at a strategic time to inflict as much damage as possible upon its competitors.

---

[20] *Lockton.*, No. 2019-0226-JTL, Redacted Exhibits 1-7 and 10 to Corrected Transmittal Affidavit of Jarrett Horowitz, Ex. 7 (Del. Ch. Apr. 19, 2022) (emphasis in original).

101.    Alliant and its outside counsel understand that this strategy is unlawful and, at least, tortiously interferes with contracts. That is why Alliant's counsel told Alliant executives that "we are no longer instructing employees in writing to resign without notice because they may have notice provisions – Alliant will instead instruct them verbally"[21] and also advised Alliant to "[b]lock the new hires' email account from being able to receive emails from their personal email accounts for a limited time period after the hire date (during the time period in which new hires are contracting their clients in an effort to obtain business; i.e., during the time period where at TRO/PI is most likely)."[22] In so doing, Alliant's counsel instructed Alliant to create a façade of protecting its competitors while in fact intentionally violating their contracts.

102.    Alliant focuses on requiring its new recruits to resign "effective immediately," in breach of industry norms and, often, of these recruits' contractual notice provisions, precisely because it understands that its conduct is likely to result in injunctive relief.

103.    The *Lockton* court found that "[it] is reasonably probable that a trier of fact would find that Alliant induced the Producer Members to breach the notice requirement so that Lockton would not have this opportunity and instead would face immediate competition from the Producer Members. Alliant took other actions to limit Lockton's ability to respond, such as by preparing preemptive litigation and by coordinating the mass resignations for Tuesday, March 12[.]" *Lockton*, 2019 WL 2536104, at *19 n.21.

---

[21] *Lockton*, No. 2019-0226-JTL, Exhibits 11, 14-16, 43, 48-50, 54, 59-60, 62-65, 67-69, 73-75, 77, 80-82 and 86 to the Transmittal Affidavit of Jarrett Horowitz, Ex. 14 at ALLIANT00090188 (Del. Ch. Apr. 27, 2022).

[22] *Lockton*, No. 2019-0226-JTL, Exhibits 11, 14-16, 43, 48-50, 54, 59-60, 62-65, 67-69, 73-75, 77, 80-82 and 86 to the Transmittal Affidavit of Jarrett Horowitz, Ex. 11 at ALLIANT00090867 (Del. Ch. Apr. 27, 2022),

104.     Alliant understands that time is of the essence for its competitors to protect their business, which is why it coordinates mass resignations and does everything in its power to handcuff competitors. Enjoining Alliant *before* it can steal enough business to make its scheme profitable is the only way to mitigate the unlawful conduct and prevent irreparable harm to Alliant's competitors. MMA will be irreparably harmed if the Court does not grant injunctive relief and enjoin Alliant from further harming its business.

## COUNT I

### Breach of the MMA Agreement –
### Client Non-Solicitation
### (Against Osborne)

105.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 105 above.

106.    Osborne voluntarily executed the MMA Agreement at the outset of his employment with MMA.

107.    Osborne's MMA Agreement is a valid and binding contract, in exchange for which Osborne received good and valuable consideration, including employment with MMA.

108.    Osborne breached the terms of his MMA Agreement, among other things, directly and/or indirectly:

      a)  soliciting clients of MMA for the purpose of selling or providing products or services of the type sold or provided by Osborne while employed by MMA;

      b)  inducing clients and/or prospective clients of MMA to terminate, cancel, not renew, or not place business with MMA; and/or

      c)  assisting others to do the acts specified above.

109.    MMA fully performed its obligations under the MMA Agreement with Osborne.

110.   As a direct and proximate result of Osborne's breaches of his MMA Agreement, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer further harm unless and until Osborne is restrained from his current conduct and compelled to abide by the terms of his MMA Agreement.

111.   As a direct and proximate result of Osborne's breaches of his MMA Agreement, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

**COUNT II**
**Breach of the MMA Agreement –**
**Client Non-Servicing**
**(Against Osborne, Stone, and Margaux)**

112.   MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 112 above.

113.   Osborne, Stone, and Murray voluntarily executed the MMA Agreements at the outset of their employment.

114.   The MMA Agreements are valid and binding contracts, in exchange for which Osborne, Stone, and Murray received good and valuable consideration, including employment with MMA.

115.   Osborne, Stone, and Murray each breached the terms of their MMA Agreement by, among other things, directly and/or indirectly performing or supervising the performance of services or the provision of products, of the type sold or provided by Osborne, Stone, and Murray

while they were employed by MMA, on behalf of clients and/or prospective clients of MMA; and/or assisting others in those acts.

116.    MMA fully performed its obligations under the MMA Agreements.

117.    As a direct and proximate result of Osborne's, Stone's, and Murray's breaches of their MMA Agreements, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer further harm unless and until Osborne, Stone, and Murray are restrained from their current conduct and compelled to abide by the terms of their MMA Agreements.

118.    As a direct and proximate result of Osborne's, Stone's, and Murray's breaches of their MMA Agreements, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

<u>**COUNT III**</u>
**Breach of the MMA Agreement –**
**Employee Non-Solicitation**
**(Against Osborne)**

119.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 119 above.

120.    Osborne voluntarily executed the MMA Agreement at the outset of his employment with MMA.

121.    Osborne's MMA Agreement is a valid and binding contract, in exchange for which Osborne received good and valuable consideration, including employment with MMA.

122.    Osborne breached the terms of his MMA Agreement by, among other things, directly or indirectly, soliciting or otherwise endeavoring to cause employees of MMA with whom Osborne, during his final two years at MMA, had come into contact for the purpose of soliciting or servicing business or about whom Osborne had obtained Confidential Information and Trade Secrets (as defined in his MMA Agreement) to leave employment with MMA.

123.    Specifically, Osborne breached his MMA Agreement by soliciting or otherwise endeavoring to cause Stone and Murray to leave employment with MMA. During his last two years of employment at MMA, Osborne repeatedly came into contact with Stone and Murray for the purpose of soliciting or servicing business, and also repeatedly obtained confidential information about Stone and Murray.

124.    MMA fully performed its obligations under Osborne's MMA Agreement.

125.    As a direct and proximate result of Osborne's breaches of his MMA Agreement, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer further harm unless and until Osborne is restrained from his current conduct and compelled to abide by the terms of his MMA Agreement.

126.    As a direct and proximate result of Osborne's breaches of his MMA Agreement, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

**COUNT IV**
**Breach of MMA Agreement – Confidentiality**
**(Against Osborne)**

127.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 127 above.

128.    Osborne voluntarily executed the MMA Agreement at the outset of his employment with MMA.

129.    Osborne's MMA Agreement is a valid and binding contract, in exchange for which Osborne received good and valuable consideration, including employment with MMA.

130.    By committing the above-described acts, Osborne violated his MMA Agreement, including by violating his confidentiality covenant by using and disclosing MMA's confidential information to and for the benefit of a third party.

131.    MMA has performed all of its obligations under the Osborne MMA Agreement.

132.    As a direct and proximate result of Osborne's breaches of the Osborne MMA Agreement, MMA has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. MMA will continue to suffer further harm unless and until Osborne is restrained from his current conduct and compelled to abide by the terms of his MMA Agreement.

133.    As a direct and proximate result of Osborne's breaches of his MMA Agreement, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

<u>**COUNT V**</u>
**Trade Secret Misappropriation Under the Defend Trade Secrets Act, 18 U.S.C. § 1836**
**(Against Osborne and Alliant)**

134.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 134 above.

135.    Osborne and Alliant violated the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.* (the "DTSA") by misappropriating trade secrets from MMA for services used in, or intended for use in, interstate or foreign commerce.

136.    Osborne and Alliant possess MMA's trade secrets under the Defend Trade Secrets Act in the form of, at a minimum: client contact information (including direct contact information for key client representatives), the types of policies purchased by each client, the premiums charged each client for each policy, and policy expiration or renewal dates for each policy held by each client.

137.    MMA's confidential and trade secret information relates to services used in, or intended to be used in, conducting business throughout the United States.

138.    Upon information and belief, Osborne and Alliant are using and will continue to use MMA's trade secrets to conduct business.

139.    MMA invested substantial time and resources to generate such information that Osborne misappropriated in concert with Alliant. The information contained in the misappropriated materials derives independent economic value by virtue of not being known or available to the public.  MMA has kept this information sufficiently secret to give it a competitive advantage.  It has taken affirmative measures to prevent others from acquiring it or using it by means including, but not limited to, requiring those who have access to it (including Osborne) to sign agreements restricting their use of MMA's confidential information. Access to MMA's systems, including employee computers, phones and other devices, is password protected.

140.   MMA communicated its trade secrets to Osborne in confidence and he knew that MMA intended its trade secrets to remain confidential. As such, Osborne promised to keep MMA's trade secrets confidential, to use MMA's trade secrets only on behalf of MMA, and to return and discontinue use of MMA's trade secrets when his employment with MMA ended.

141.   At Alliant's direction and for its benefit, Osborne misappropriated MMA's trade secrets by improper acquisition, unauthorized disclosure, or unauthorized use.

142.   Due to his position working for a direct competitor of MMA, and his possession of MMA's trade secrets and confidential and proprietary information, there is a substantial likelihood that Osborne has disclosed or used, and will continue to use, MMA's trade secrets.

143.   As a direct and proximate result of Osborne's unlawful conduct, MMA has been irreparably damaged, and Osborne and Alliant have been unjustly enriched. This unjust enrichment includes value attributable to the misappropriated information, amounts that Osborne and Alliant saved in costs and development by using the misappropriated information, and increased productivity resulting from the use of the misappropriated information and increased market share. The exact amount of these damages and unjust enrichment is not presently ascertainable, but is believed to be in excess of several hundreds of thousands of dollars and increasing each month.

144.   The acts described above constituted willful and malicious misappropriation in that Osborne, at Alliant's direction, stole an alarming amount of proprietary information and did so with the deliberate intent to injure MMA's business and improve his and Alliant's own.  Accordingly, MMA is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1836 and exemplary damages under 18 U.S.C. § 1836.

145.   As a direct and proximate result of Osborne's conduct, at Alliant's direction, and continued use of MMA's misappropriated trade secrets, MMA has suffered and will continue to suffer extensive injury and harm to its business.

146.    As a direct and proximate result of Osborne's conduct, at Alliant's direction, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

**<u>Count VI</u>**
**Breach of Fiduciary Duty**
**(Against Osborne)**

147.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 147 above.

148.    By virtue of Osborne's position at MMA, the special relationship of trust and confidence reposed by MMA in him, and the permission afforded him by MMA to its access its confidential, proprietary and trade secret information, Osborne was required to act solely in MMA's interest. Osborne also had duties of loyalty and utmost good faith to MMA and was obligated not to subvert or misappropriate MMA's confidential and trade secret information or business opportunities.

149.    Osborne breached his fiduciary duties owed to MMA by, among other things: (i) concealing from MMA that he had accepted an offer to join Alliant and deceiving MMA into believing that it had his undivided loyalty, including deceiving MMA into permitting him to continue to have access to its confidential, proprietary and trade secret information and to communicate with its clients and employees after he had accepted an offer of employment from Alliant; (ii) while still employed by MMA, soliciting MMA's clients to move their business from MMA to Alliant; and (iii) while still employed by MMA, soliciting MMA employees to leave their employment with MMA and join Alliant.

150.    As a direct and proximate result of Osborne's breaches of his fiduciary duties, MMA has suffered extensive injury, loss of goodwill, harm to its business, and other damages.

151.    As a direct and proximate result of Osborne's breaches of his fiduciary duties, MMA already has suffered and will continue to suffer additional damages in an amount that is presently unascertainable, including but not limited to attorneys' fees and costs related to this litigation, as well as lost business, in an amount to be proven at trial.

152.    Osborne committed these acts knowingly, willfully and in conscious disregard of MMA's rights. Accordingly, MMA is entitled to recover actual and exemplary damages in an amount to be proven at trial.

<u>**COUNT VII**</u>
**Aiding and Abetting Breach of Fiduciary Duty**
**(Against Alliant)**

153.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 153 above.

154.    Osborne owed a fiduciary duty of loyalty to MMA during his employment with MMA.

155.    Osborne's fiduciary duty of loyalty prohibited him from, among other things, competing with MMA by soliciting MMA clients and employees away to do business with a competitor.

156.    Osborne violated his fiduciary duty of loyalty by soliciting MMA's clients away from MMA to do business with Alliant while Osborne was still employed with MMA.

157.    Osborne violated his fiduciary duty of loyalty by soliciting MMA's employees away from MMA to join Alliant while Osborne was still employed with MMA.

158.    Alliant knowingly participated in Osborne's breaches of his duty of loyalty by encouraging and substantially assisting Osborne's breaches of his duty of loyalty.

159.    As a direct and proximate result of Alliant's wrongful conduct, MMA has suffered and will continue to suffer extensive injury and harm to its business.

160.    As a direct and proximate result of Alliant's wrongful conduct, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

<u>**COUNT VIII**</u>
**Tortious Interference with Contract**
**(Against Alliant)**

161.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 161 above.

162.    Alliant was aware of the employment relationship that MMA had with Osborne, Stone, and Murray, and their contractual obligations to MMA to refrain from soliciting or servicing MMA clients and employees after the termination of their employment and to refrain from using or disclosing MMA's confidential information for the benefit of any third party.

163.    Alliant, improperly and without privilege, interfered in MMA's contracts with Osborne, Stone, and Murray by inducing, enticing and directing them to breach their contractual obligations to MMA, including, without limitation, by encouraging and assisting them in the solicitation of MMA's clients to move their business to Alliant, the servicing of MMA clients at Alliant, the solicitation of MMA employees to leave their employment at MMA and join Alliant, and the misappropriation of MMA's confidential information.

164.    As alleged above, Osborne, at Alliant's inducement and direction, violated the MMA Agreement by, without limitation, violating his client non-solicitation covenants by soliciting MMA clients to move their business from MMA to Alliant and servicing MMA clients at Alliant. Alliant was aware of Osborne's contractual obligations, but directed him to violate them for Alliant's benefit.

165.    As alleged above, Osborne, at Alliant's inducement and direction, violated the MMA Agreement by, without limitation, violating his employee non-solicitation covenants by soliciting MMA employees to leave their employment at MMA and join Alliant. Alliant was aware of Osborne's contractual obligations, but directed him to violate them for Alliant's benefit.

166.    As alleged above, Osborne, at Alliant's inducement and direction, violated the MMA Agreement by, without limitation, violating his confidentiality covenant by using and disclosing MMA's confidential information for Alliant's benefit.  Alliant was aware of Osborne's contractual obligations but directed him to violate them for Alliant's benefit.

167.    The foregoing conduct was willful and intentional and has already caused and will continue to cause damage to MMA with respect to its relationships with its clients.

168.    As a direct and proximate result of Alliant's wrongful conduct, MMA has suffered and will continue to suffer extensive injury and harm to its business.

169.    As a direct and proximate result of Alliant's wrongful conduct, MMA already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## <u>COUNT IX</u>
## Tortious Interference with Contract
## (Against Alliant and Osborne)

170.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 170 above.

171.    Alliant and Davis were aware of the employment relationship between Stone and Murray, on the one hand, and MMA, on the other hand, and their contractual obligations to MMA refrain from soliciting or servicing MMA clients and to refrain from using or disclosing MMA's confidential information for the benefit of any third party.

172.    Alliant and Osborne, improperly and without privilege, interfered in MMA's contracts with Stone and Murray by inducing, enticing and directing them to breach their contractual obligations to MMA, including, without limitation, by encouraging and assisting them in servicing MMA's clients at Alliant. .

173.    As alleged above, Stone and Murray, at Alliant's and Osborne's inducement and direction, have violated and are and will be violating their MMA Agreements by, without limitation, violating their client non-servicing covenants by servicing MMA clients at Alliant. Alliant and Osborne were aware of Stone's and Murray's contractual obligations, but directed them to violate them for Alliant's benefit.

174.    The foregoing conduct was willful and intentional and has already caused and will continue to cause damage to MMA with respect to its relationships with its clients.

175.    As a direct and proximate result of Alliant's and Osborne's wrongful conduct, MMA has suffered and will continue to suffer extensive injury and harm to its business.

176.    As a direct and proximate result of Alliant's and Osborne's wrongful conduct, MMA has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

**COUNT X**
**Tortious Interference with Business Relations**
**(Against Alliant and Osborne)**

177.    MMA realleges and incorporates by reference herein the allegations set forth in Paragraphs 1 through 177 above.

178.    MMA had ongoing relationships with its clients.

179.    As a high-level Producer and client contact at MMA, Osborne had influential relationships with MMA's clients, which were developed and strengthened over the years by virtue

of his access to and knowledge of MMA's confidential and trade secret information, which Osborne used to form successful relationships with MMA's clients.

180.    Osborne and Alliant have knowledge about MMA's relationships with its clients.

181.    Despite this knowledge, Osborne and Alliant have intentionally and improperly interfered with the relationships between MMA and its clients by soliciting MMA's clients to cease their business with MMA and move their business to Alliant.

182.    Osborne and Alliant engaged in wrongful conduct in doing so, by (among other things) Osborne breaching his contractual and fiduciary duties to MMA, with Alliant's knowledge, assistance, and encouragement. On information and belief, Osborne and Alliant further accomplished their wrongful solicitation of the MMA clients for which Osborne had been responsible at MMA by assuring the clients that the same client service team that serviced their accounts at MMA (Osborne, Stone and Murray) would personally service their accounts at Alliant, despite Osborne's and Alliant's knowledge that Osborne, Stone, and Murray were prohibited from doing so per their contracts with MMA.

183.    Osborne's and Alliant's conduct extends beyond the boundaries fair competition and has been tortious, in bad faith, dishonest, and designed to harm MMA.

184.    Osborne and Alliant were aware that this conduct would disrupt MMA's business relationships, and intended this disruption to occur for the benefit of themselves.

185.    As a direct and proximate result of Osborne's and Alliant's conduct, MMA has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

**Count XI**
**Conspiracy**
**(Against Alliant and Osborne)**

186.    MMA incorporates by reference paragraphs 1 through 187 as though fully stated herein.

187.    As alleged more fully above, Alliant, acting in concert with Osborne, reached an agreement among themselves to unlawfully interfere with MMA's business relations and contracts and for Osborne to breach his contractual obligations and fiduciary duties owed to MMA.

188.    Alliant and Osborne constitute a combination of two or more persons, and they acted in concert for the purpose of harming MMA's business to Alliant's benefit.

189.    In furtherance of their conspiracy, each of these co-conspirators committed overt unlawful and tortious acts, including those described herein, and were otherwise willful participants in joint activity.

190.    As a direct and proximate result of Alliant's and Osborne's conspiratorial conduct, MMA has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## <u>JURY TRIAL DEMAND</u>

MMA hereby demands a jury trial as provided by Rule 38 of the Federal Rules of Civil Procedure as to all issues or claims for which a jury trial is allowed.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Marsh & McLennan Agency, LLC respectfully requests that the Court enter judgment in its favor and against Alliant Insurance Services, Inc. as follows:

    a.   Entry of preliminary and permanent injunctive relief;

    b.   Awarding damages, together with pre- and post-judgment interest;

c.  Entry of judgment awarding MMA any compensation amounts paid to Osborne during the period of his disloyalty;

d.  Entry of judgment awarding MMA its reasonable costs and attorneys' fees incurred in connection, as expressly provided under the MMA Agreements, as well as under the DTSA;

e.  Awarding punitive damages; and

f.  Granting such other and further relief as this Court deems just and proper.

Dated: December 23, 2024
       New York, New York

EPSTEIN, BECKER & GREEN, P.C.

By:    */s/ David W. Garland*
       DAVID W. GARLAND
       A.  MILLIE WARNER

875 Third Avenue
New York, New York 10022
(212) 351-4500

*Attorneys for Plaintiff Marsh & McLennan Agency, LLC*