# EXHIBIT D



## EMPLOYMENT AGREEMENT

**This Employment Agreement** (the "***Agreement***") is effective March12, 2019 (the "***Effective Date***") between **Gregory Winter, an individual** ("***Employee***"), and **Alliant Insurance Services, Inc., a Delaware corporation** ("***Alliant***"), collectively referred to as the "***Parties***."

1. **Definitions.** The following definitions apply in this Agreement:

   (a) **"*Account(s)*"** is defined as any and all new or existing Business written or conducted with any Alliant Customer, whether or not produced by Employee.

   (b) **"*Affiliate*"** is defined in Rule 405 under the Federal Securities Act of 1933, as amended.

   (c) **"*Business*"** is defined as any and all insurance, surety, risk management services, professional services, and related services and activities that Alliant brokers or otherwise provides to Customers or Prospective Customers.

   (d) **"*Cause*"** is defined as:

      (i) Employee's willful and continued failure to substantially perform Employee's duties as set forth herein that is not cured by Employee within 10 days following written notice by Alliant to Employee of such failure;

      (ii) Employee's theft or embezzlement of Alliant's Property;

      (iii) Dishonesty in the performance of Employee's duties resulting in material harm to Alliant;

      (iv) Any conviction of Employee that constitutes (A) a felony under the laws of the United States or any state thereof or (B) any other crime involving moral turpitude;

      (v) Employee's material misconduct in connection with Employee's duties to Alliant that could reasonably be expected to be materially injurious to the financial condition or business reputation of Alliant or any of its subsidiaries or Affiliates; or

      (vi) Employee's material breach of Section 9 of this Agreement.

   (e) **"*Competing Business*"** is defined as any person, business, firm, partnership, association, corporation or business organization, entity or enterprise (other than Alliant or its Affiliates) that brokers, sells, or markets insurance, surety, risk management services, and related professional services.

   (f) **"*Customer(s)*"** is defined as any and all clients for whom Alliant performs or will perform services, or to whom Alliant sells or licenses, or will sell or license, products.

   (g) **"*Prospective Customer(s)*"** is defined as any and all leads and contacts of potential Customers, whether or not obtained or made by Employee during his employment, including, without limitation, all leads and contacts who are listed, or who become listed, on any of Alliant's agency management systems.

   (h) **"*Property*"** is defined as any tangible thing, or writing, as defined by applicable state law, including, but not limited to, all documents, electronically-stored information, all records, files, memoranda, reports, price lists, customer lists, plans, keys, codes, computer hardware and software, and other property of any kind or description (and any duplicates of any such

Confidential                                                                                    ALLIANT00064312

property) prepared, used, or possessed by Employee during his employment by Alliant, including, without limitation, Accounts now or hereafter on Alliant's books (including, but not limited to, all Accounts that Employee brings to Alliant at the beginning of his employment), all information concerning Accounts, Customers, and Prospective Customers (including, but not limited to, all customer lists, expiration lists and related records, and all lists on any of Alliant's agency management systems), all rights to Customer payments, and all goodwill in connection with Customers, Accounts, and Prospective Customers. Information that is readily ascertainable through public sources, such as the identity, location, and contact information for past or present Customers, or Prospective Customers, is excluded from the definition of "Property."

(i) **"Restricted Period"** is defined as the two-year period following the date on which Employee's employment with Alliant terminates, for any reason, including his resignation, except not in the event that Employee is terminated involuntarily without Cause.

(j) **"Total Disability"** is defined as Employee's inability to perform the essential functions of his position, with or without reasonable accommodation if required by law, due to a mental or physical injury, illness, or condition.

2. **Employment.**

(a) **Title and Duties.** Employee's job title will be Producer. Employee's duties and responsibilities will include soliciting Business and producing, servicing, and retaining new and existing Accounts for and on behalf of Alliant, and all such other duties and responsibilities as Alliant may reasonably assign from time to time. Alliant reserves the right to modify Employee's position and duties at any time.

(b) **Full-time and Best Efforts.** Employee will expend his best efforts on behalf of Alliant, will act in Alliant's best interest at all times, and will devote his full business time and efforts to the performance of his assigned duties. Notwithstanding the foregoing, Employee may engage in charitable and community affairs, and the management of personal passive investments in accordance with Section 11 below, provided that these activities do not interfere with the performance of Employee's duties under this Agreement.

(c) **Work Location.** Employee's work location will be Denver, Colorado.

(d) **Placement.** All new and renewal Business produced by Employee during his employment under this Agreement shall be written exclusively through Alliant. At Alliant's discretion, Alliant will be free to decline any Business produced by Employee if, in its sole opinion, the Business appears to be unprofitable or undesirable.

(e) **Compliance.** Employee shall perform his duties in accordance with all Alliant policies, rules, and procedures, and shall abide by all decisions made by Alliant. To the extent any conflict exists between the terms of this Agreement and Alliant's Code of Business Conduct and Ethics or any other Alliant policies, rules, and procedures, the terms of this Agreement will control. Employee also shall not commit any unlawful, immoral, fraudulent, or dishonest acts to the discredit of Alliant. Employee shall comply with all applicable federal, state, and local laws, regulations, and ordinances including, but not limited to, all licensing requirements, and all other insurance laws and regulations of each state in which Employee solicits Business for Alliant (collectively, **"Applicable Law"**). Employee acknowledges and agrees that any authority granted to him under this Agreement is subject to restrictions set forth under Applicable Law.

(f) **Premium Billing and Collection.** All premiums and fees, whether billed by Alliant or

**Alliant**
Employment Agreement                    Page 2 of 19                    Initials _GW_

directly billed by a carrier, shall be owed to Alliant. All checks and drafts in payment of such premiums shall be made payable to Alliant. Employee shall deliver all money received in payment of premiums or other fees to Alliant in the form received and deposited to Alliant's designated accounts. Employee agrees that all money collected by him on behalf of Alliant shall be held by Employee, in a fiduciary capacity, shall be governed by Applicable Law, and shall not be commingled with Employee's personal funds. Employee shall assist in collecting premiums and fees and pursuing any uncollected premiums or fees for new and renewal Business produced by him.

3.  **Compensation.**

    (a) **Compensation.** As compensation for services rendered under this Agreement, Alliant shall pay Employee the compensation specified in Exhibit A. This compensation may be modified as provided in Exhibit A.

    (b) **Benefits.** Employee will be eligible for all customary group benefits that are generally afforded to similarly situated employees at Alliant including, but not limited to, group life and medical insurance, and 401k plans, subject to the terms and conditions of Alliant's benefit plan documents. Alliant reserves the right to change or eliminate any and all fringe benefits on a prospective basis, at any time, effective upon notice to Employee.

    (c) **Equity.** Employee will be entitled to receive equity subject to the terms and conditions set forth in Exhibit C and in any governing documents effecting the equity's issuance.

4.  **Business Expenses.** Alliant will reimburse Employee for reasonable, out-of-pocket business expenses Employee incurs in the performance of his duties for Alliant, subject to Alliant's expense reimbursement policy. In addition, Alliant will pay all usual and ordinary license fees, as well as all promotional or advertising expenses that it deems necessary. To obtain reimbursement, covered expenses must be submitted promptly with appropriate supporting documentation in accordance with Alliant's applicable policies.

5.  **Social Media.** Employee shall not, without Alliant's written approval and consent or unless allowed by Alliant's written policies, place or cause to be broadcast, disseminated, or published, including on Facebook or on any social media account of Employee, any advertising of Employee's activities on behalf of Alliant.

6.  **Initial Term; At-Will Employment.**

    (a) **Initial Term.** Employee's employment with Alliant under this Agreement will have an initial term of 36 months from the Effective Date (the **"Initial Term"**); provided that Employee's employment hereunder may be terminated earlier in accordance with Section 7 below.

    (b) **At-Will Employment.** Notwithstanding the Initial Term, Employee's employment with Alliant will always be on an "at-will" basis and, accordingly, may be terminated at any time, with or without Cause, and with or without notice, except as expressly provided for in this Agreement. Employee may also be transferred, reassigned, suspended, or demoted with or without Cause and with or without notice. Employee's at-will status may be altered only by an express written agreement signed by Employee and by Alliant's President. Employee understands and agrees that no oral agreement or statement of any kind, nor any handbook provision or other published policy or procedure, nor any other conduct of the Parties can alter this at-will relationship. The period during which Employee remains employed by Alliant (including for the sake of clarity, both the Initial Term and any period following the Initial Term) is referred to in this Agreement as the **"Employment Period."** This Agreement shall automatically terminate concurrently with the termination of Employee's employment for any

Confidential                                                                              ALLIANT00064314

reason.

7. **Right to Terminate Employment; Rights upon Termination of Employment.**

    (a) **Right to Terminate Employment.**

        (i) **Termination by Alliant without Cause.** Alliant shall have the right to terminate Employee's employment without Cause at any time and, subject to the terms set forth in Section 7(b) below, all of Alliant's obligations hereunder, by giving Employee written notice to that effect. Any such termination of employment shall be effective on the date specified in such notice.

        (ii) **Termination by Alliant for Cause.** Alliant shall have the right to terminate Employee's employment for Cause at any time and, subject to the terms set forth in Section 7(b) below, all of Alliant's obligations hereunder, by giving Employee written notice to that effect. Any such termination of employment shall be effective on the date specified in such notice.

        (iii) **Termination by Death or Disability.**

           (A) **Death.** If Employee dies during his employment hereunder, this Agreement and, subject to the terms set forth in Section 7(b) below, all of Alliant's obligations hereunder, shall terminate upon the date of Employee's death.

           (B) **Disability.** Subject to applicable law, Alliant shall have the right to terminate Employee's employment hereunder because of Employee's Total Disability, and, subject to the terms set forth in Section 7(b) below, all of Alliant's obligations hereunder, by giving Employee 30 days' prior written notice to that effect, after a determination of Employee's Total Disability. Employee will cooperate in submitting to a medical examination for the purpose of determining Total Disability under this section, if required by Alliant and allowed by law.

        (iv) **Resignation by Employee.** Employee may resign his employment, and subject to the terms set forth in Section 7(b) below, terminate Alliant's obligations hereunder, at any time by providing Alliant with 30 days' advance written notice. The termination of employment shall be effective on the date specified in such notice. In the event that such notice is given, Alliant may require Employee to leave immediately; in which event, Employee must be compensated under this Agreement for the notice period in a manner commensurate to the compensation Employee would have received during the notice period had his employment not been terminated by him.

    (b) **Rights upon Termination of Employment.**

        (i) **Termination without Cause.** If Employee's employment is terminated by Alliant without Cause pursuant to Section 7(a)(i) above, then Employee shall have no further rights against Alliant hereunder, except for the right to receive:

           (A) any salary earned through the effective date of termination that remains payable ("***Final Pay***"), payable within 30 days following the date of termination or such earlier date as required by law;

           (B) any Personal Commissions that remain payable to Employee pursuant to the terms of Exhibit A ("***Final Commissions***");

(C)    reimbursement of expenses to which Employee is entitled under <u>Section 4</u> of this Agreement ("***Final Expenses***") (Final Pay, Final Commissions, and Final Expenses are collectively, the ***"Accrued Obligations"***); and

(D)    where the effective date of such termination occurs during the Initial Term, then subject to the paragraph immediately following this paragraph, Employee will be eligible to receive ***"Severance Payments"*** of amounts equal to normal installments of Employee's base salary at the time of his termination, less applicable withholdings and payable on Alliant's then-regular payroll schedule, for the period commencing on the effective date of such termination and ending on the final day of the Initial Term.

Notwithstanding the foregoing, (x) no portion of the Severance Payments shall be paid, unless, on or prior to the 60th day following the effective date of such termination, Employee timely executes a general release of claims satisfactory to Alliant, releasing all claims, known or unknown, that Employee may have against Alliant arising out of or in any way related to Employee's employment or termination of that employment (the "***General Release***"), and such General Release shall not have been revoked by Employee within the time period established by the General Release and applicable law, (y) any of the Severance Payments that, absent this sentence, would otherwise have been paid prior to the final day of such revocation period, shall instead be paid within 10 business days thereafter, and (z) all Severance Payments shall immediately terminate upon a breach by Employee of any of the provisions of <u>Section 9</u> of this Agreement. Employee acknowledges that should he become ineligible to receive the Severance Payments due to his breach of <u>Section 9</u> of this Agreement, such ineligibility and cessation of payment will not affect his waivers and releases.

(ii)    <u>**Termination by Alliant for Cause; Death or Disability; Employee's Resignation**</u>. If Employee's employment is terminated pursuant to <u>Section 7(a)(ii)</u>, <u>7(a)(iii)</u> or <u>7(a)(iv)</u> of this Agreement, then Employee shall have no further rights against Alliant under this Agreement, except for the right to receive the Accrued Obligations. Employee shall continue to be fully bound by the continuing obligations of this Agreement, any equity documents, and/or any General Release.

(iii)    <u>**Exclusive Remedy**</u>. The amounts payable to Employee following termination of employment hereunder pursuant to <u>Section 7(b)</u> hereof shall be in full and complete satisfaction of Employee's rights under this Agreement and any other claims that Employee may have in respect of Employee's employment with Alliant or any of its Affiliates (except to the extent that such claims are statutorily non-waivable), and Employee acknowledges that such amounts are fair and reasonable and are Employee's sole and exclusive remedy in lieu of all other remedies at law or in equity, with respect to the termination of Employee's employment hereunder or any breach of this Agreement. For the sake of clarity, the payments and benefits provided in this <u>Section 7(b)</u> shall be in lieu of any termination or severance payments and severance benefits for which Employee may be eligible under any of the plans, policies or programs of Alliant or under the Worker Adjustment Retraining Notification Act of 1988 or any similar state statute or regulation.

## 8.  <u>Section 409A</u>.

(a)  <u>**Compliance**</u>. The intent of the parties is that payments and benefits under this Agreement be exempt from or comply with Section 409A of the Internal Revenue Code and the regulations thereunder (***"Section 409A"***). This Agreement shall be interpreted and administered accordingly. However, Alliant does not warrant to Employee that all the

amounts paid or delivered to him will be exempt from, or paid in compliance with, Section 409A. Employee understands and agrees that he bears the entire risk of any adverse federal, state, or local tax consequences, including penalties to Employee, which may result from payment under this Agreement, contrary to the provisions of Section 409A or comparable provisions of any applicable state or local income tax laws, provided that such taxes, interest or penalties are not caused by Alliant's own negligence. Employee acknowledges that he has been advised to seek the advice of a tax advisor with respect to the tax consequences of all such payments.

(b) **Termination.** If and to the extent necessary to comply with Section 409A, for the purpose of determining when amounts otherwise payable on account of Employee's termination of employment under this Agreement will be paid, "terminate," "terminated," "termination," or words of similar import relating to Employee's employment with Alliant, as used in this Agreement, shall be construed as the date Employee first incurs a "separation from service" within the meaning of Section 409A from Alliant.

(c) **Reimbursements.** Amounts reimbursable to Employee shall be paid to him on or before the last day of the year following the year in which the expense was incurred and the amount of expenses eligible for reimbursement (and in kind benefits provided to Employee) during one year may not affect amounts reimbursable or provided in any subsequent year.

(d) **Interpretive Rules.** For purposes of applying the provisions of Section 409A to this Agreement, each separately identified amount to which the Employee is entitled under this Agreement shall be treated as a separate payment. In addition, to the extent permissible under Section 409A, any series of installment payments under this Agreement shall be treated as a right to a series of separate payments.

9. **Covenants by Employee.**

(a) **Property Rights.**

(i) **Company Property.** Employee expressly acknowledges that all Alliant Property is and will be Alliant's exclusive property and, upon separation of employment from Alliant for any reason, or upon Alliant's request at any time, Employee shall promptly return to Alliant all Property that had been entrusted or made available to him as an employee. Employee acknowledges that Alliant's exclusive ownership will continue during and after the termination of his employment. Employee further acknowledges that he has no ownership interest or rights of any kind in or to any of the Alliant Property including, without limitation, any Accounts, even if Employee may be coded or otherwise identified as a source of production on such Accounts. Alliant's exclusive ownership related to Prospective Customers expressly includes, but is not limited to, all leads and contacts obtained or made by Employee during his employment.

(ii) **Intellectual Property.**

(A) **Defined.** *"Intellectual Property"* means any and all intellectual property and proprietary rights including: (i) inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, utility models, certificates of inventions, design patents, and reexaminations thereof; (ii) trademarks including service marks, trade dress, design rights, logos, trade names, slogans, assumed names, trade names, corporate names domain names and other URLS and social media accounts, together with all translations,

adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (iii) copyrights including all copyrightable works (including all website content, documentation, advertising copy, marketing materials, specifications, translations, drawings, and graphics) and all applications, registrations and renewals in connection therewith; (iv) Confidential Information; (v) Software; (vi) the right to sue for past, present and future infringement and to retain all remedies including damages resulting from such suits, together with all forms of legal rights and protection that may be obtained for any of the foregoing in (i) through (v) anywhere in the world; and (vii) copies of tangible embodiments of any of the foregoing in (i) through (v) (in whatever form or medium).

"**Software**" means all: (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, and documentation, and (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise.

(B)  <u>Ownership.</u>  Employee acknowledges that Intellectual Property that is conceived, created, developed, designed, or reduced to practice by Employee, alone or with others, during the course and/or within the scope of employment with Alliant, its parents, subsidiaries, or Affiliates, whether before or after the date of this Agreement, belong to Alliant, its parents, subsidiaries, or Affiliates (collectively, "***Company Intellectual Property***").  Employee agrees to and hereby does irrevocably assign to Alliant, without further consideration, all right, title, and interest that he may presently have or acquire (throughout the United States and in all foreign countries), free and clear of all liens and encumbrances, in and to each Company Intellectual Property, and each such Company Intellectual Property shall be Alliant's sole property, whether or not patentable, copyrightable or otherwise legally protectable.  In addition, to the extent not assigned, Employee hereby irrevocably waives any moral rights (including rights of attribution and integrity) that he may have with respect to the Company Intellectual Property.  Employee acknowledges that all original works of authorship that are made by him (solely or jointly with others) during the course of his employment with Alliant, its parents, subsidiaries, or Affiliates, and that are protectable by copyright, are "Works Made For Hire" as defined in the United States Copyright Act (17 USCA § 101), and are included in the definition of Company Intellectual Property.

(C)  <u>Retained Intellectual Property.</u>  The attached <u>Exhibit B</u> is Employee's list describing all Intellectual Property made or developed by him prior to the date of this Agreement, and that relate to Alliant's Business or proposed Business products, services, or research and development, and that are not assigned to Alliant by this Agreement (collectively "***Retained Intellectual Property***"). Employee represents <u>Exhibit B</u> is a complete list of his Retained Intellectual Property.  If no Retained Intellectual Property is listed in this exhibit, then no Retained Intellectual Property exists, or such Retained Intellectual Property has already been assigned to Alliant, or is being assigned to Alliant by this Agreement.  If during the course of his employment with Alliant or its Affiliates, Employee incorporates into an Alliant product, process, or machine a Retained Intellectual Property owned by Employee, or in which Employee has an interest, Alliant is hereby granted and shall have a non-exclusive, royalty-free, irrevocable, assignable, sub-licensable, perpetual, worldwide license to make, have made, reproduce, modify, adapt, distribute, display, perform, use, import,

Confidential                                                                    ALLIANT00064318

offer to sell, and sell such Retained Intellectual Property as part of, or in connection with, such product, process, or machine.

(D)  **Patent and Copyright Registrations.**  Employee agrees to assist Alliant or its designee, at Alliant's expense, in securing Alliant's rights in and to the Company Intellectual Property (including those assigned or arising by this Agreement) and any copyrights, patents, trademarks, service marks, mask work rights, or other similar intellectual property rights in any and all countries.  Such assistance shall include: the disclosure to Alliant of all pertinent information and data; and the execution of all applications, specifications, oaths, assignments, and confirmatory assignments, and all other instruments Alliant deems necessary in order to apply for and obtain such rights, and in order to assign and convey to Alliant, its successors, assigns, and nominees or confirm assignment of the sole and exclusive rights, title, and interest in and to such Company Intellectual Property, and any copyrights, patents, trademarks, service marks, mask work rights, or other intellectual property rights relating thereto.  Employee agrees that his obligation to execute, or cause to be executed when it is in his power to do so, any such instrument or papers continues after the termination of his employment, for whatever reason.  If for any reason Alliant is unable to obtain Employee's signature to apply for or to pursue any application for any United States or foreign intellectual property rights, including patents or copyright registrations covering Company Intellectual Property or original works of authorship assigned to Alliant as provided by this Agreement, then Employee hereby irrevocably designates and appoints Alliant, and its duly authorized officers and agents, as Employee's agent and attorney-in-fact to act for and on his behalf to execute and file any such applications, and to do all other lawfully permitted acts to further the prosecution and issuance of such intellectual property rights, including letters patent, or copyright registrations, with the same legal force and effect as if personally executed by Employee.  Employee hereby irrevocably assigns to Alliant any and all claims of any nature that he now or hereafter has for past, present, or future infringement of all proprietary or intellectual property rights assigned to Alliant.

(E)  **Maintenance of Records.**  Employee agrees to maintain adequate and current written records (in the form of notes, sketches, drawings, and any other form or media requested by Alliant) on the development of all Company Intellectual Property, and to disclose promptly to Alliant all Company Intellectual Property and relevant records. The records will be available to and will remain Alliant's sole property and intellectual property at all times. Employee further agrees that all information and records pertaining to any idea, process, trademark, service mark, invention, discovery, improvement, technology, computer program, original work of authorship, design formula, discovery, patent, or copyright that Employee does not believe to be a Company Intellectual Property, but is conceived, developed, or reduced to practice by Employee (alone or with others) during the course of his employment with Alliant will be promptly disclosed to Alliant (such disclosure to be received in confidence).

(F)  **Exclusions.**  Employee knows of no existing agreement to which he is a party that would conflict with this Section 9(a)(ii).  Employee acknowledges that he has been advised that the provisions of this Agreement requiring the assignment of Company Intellectual Property do not apply to any invention that qualifies fully

**Alliant**
Employment Agreement                    Page 8 of 19                    Initials _GW_

under any Section 2870 of the California Labor Code,[1] or any comparable state law applicable to this Agreement.

(G) **Intellectual Property of Third Parties.**  Employee shall not directly or indirectly misappropriate, acquire, derive, use for the benefit of, bring to any premises of, divulge, disclose, communicate, reveal, transfer or provide access to, or share with Alliant any trade secret or other confidential, proprietary, or non-public information or intellectual property relating to a former employer or other third party without the prior written permission of such former employer or third party. Employee hereby indemnifies, holds harmless and agrees to defend Alliant and its officers, directors, partners, employees, agents, and representatives from any breach of the foregoing covenant.  Employee shall comply with all Applicable Law and all relevant policies and guidelines of Alliant, including those regarding the protection of trade secrets, confidential information, and intellectual property, and potential conflicts of interest.  Employee acknowledges that Alliant may amend any such policies and guidelines from time-to-time, and that he remains at all times bound by their most current version.

**(b) Trade Secrets.**

(i) **Defined.**  The term **"Trade Secret(s)"** means all forms and types of financial and business information of Alliant that (a) has been the subject of reasonable measures to protect its secrecy; and (b) which derives independent economic value for Alliant, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. "Trade Secrets" may include, but are not limited to:  Client lists that contain specific, customized information about customers (e.g., key contacts, specialized requirements, the habits, risk profiles, programs, sales history and insurance needs and preferences of Customers or Prospective Customers), expiration reports, records, sales reports, sales procedures, financial information, pricing techniques, price lists, and information about past, present, or pending or planned transactions of Alliant or its Affiliates; and/or information that is regularly used in the operation of Alliant's business, including but not limited to information concerning the cost, sources of supply, and methods of doing business. Information that is readily ascertainable through public sources, such as the identity, location, and contact information for past or present Customers, or Prospective Customers, is excluded from the definition of Trade Secrets.

(ii) **Limited Use and Disclosure.**  Employee acknowledges that Trade Secrets are owned by Alliant and regularly used in the operation of its business.  Alliant and its Affiliates take reasonable precautions to prevent Trade Secret dissemination to persons other than certain directors, officers, and employees, and others who have a legitimate business need to know the information in order to further the interests of Alliant and/or its Affiliates, including by having Employee sign this Agreement and using password protection on computers and computer networks. Employee acknowledges and agrees that the Trade Secrets (A) are secret and not known in the industry; (B) give Alliant, its subsidiaries, and/or Affiliates an advantage over competitors who do not know or use

---

[1] Section 2870(a) of the CA Labor Code provides: "Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (1) [r]elate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) [r]esult from any work performed by the employee for the employer."

**Alliant**
**Employment Agreement**                    Page 9 of 19                    Initials _GW_

the Trade Secrets; (C) are of such value and nature as to make it reasonable and necessary to protect and preserve the confidentiality and secrecy of the Trade Secrets; and (D) are valuable, special, and unique assets of Alliant and its Affiliates, the disclosure of which could cause substantial injury, and loss of profits and goodwill to Alliant and its Affiliates. Employee therefore agrees to hold Alliant's Trade Secrets in a fiduciary capacity for the benefit of Alliant and its Affiliates, and not misappropriate or disclose or allow to be disclosed such Trade Secrets to any individual, corporation, or other entity (other than persons engaged by Alliant to further its business interests).

(iii)    **Survival.** Employee's duty not to misappropriate, disclose, or use Trade Secrets will be effective even after Employee is no longer working for Alliant, regardless of the reason for the separation of employment. Employee acknowledges that his direct or indirect unauthorized acquisition by improper means, disclosure, or use of Trade Secrets, would constitute misappropriation of such information. This provision is intended to afford rights to Alliant and its Affiliates that are in addition to, but not in lieu of, those rights they have under the common law or applicable statutes for the protection of trade secrets or other proprietary or confidential information.

(iv)    **Notice of Immunity under the Defend Trade Secrets Act.** Notwithstanding any other provision of this Agreement, an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; which was made solely for the purpose of reporting or investigating a suspected violation of law; or which is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal; and does not disclose the trade secret, except pursuant to court order.

(c)    **Confidential Information.**

(i)    **Defined.** *"Confidential Information"* is construed to include information, in whatever format (e.g., written, electronic, oral, etc.) that Alliant and/or its Affiliates considers a Trade Secret, proprietary or confidential and which has been subject to reasonable measures to protect its confidentiality, or is required by law to be protected as confidential information. Employee acknowledges that Confidential Information may include, but is not limited to: any employee's personal medical or health information; information relating to Alliant's business strategies, marketing and/or advertising, or pricing; information relating to past, current and prospective clients, business partners or vendors (such as medical, loss history, policy expiration dates, policy limits, insured assets or risks); or, any other information protected by law.

(ii)    **Limitations on Use and Disclosure.** Employee will not at any time (whether during or after his employment with Alliant) (A) retain or use Confidential Information for his or any other person's benefit, purposes, or account; or (B) misappropriate, disclose, divulge, reveal, communicate, share, transfer, or provide access to Confidential Information to any person outside Alliant (other than its professional advisers, or other authorized entities or individuals, who are bound by confidentiality obligations) without the prior written authorization of Alliant's board of directors.

(iii)    **Form and Exclusions.** Confidential Information may be in any form, including but not limited to: any intangible form such as unrecorded knowledge, information, ideas,

**≫Alliant**
**Employment Agreement**                    Page 10 of 19                    Initials _GW_

concepts, mental impressions; or may be embodied in equipment or other tangible form, such as a document, drawings, photographs, computer code, software, or other printed or electronic media. Confidential Information does not include:

(A)   any item or data forming part of the Confidential Information that is now in, or later enters, the public domain other than as a consequence of unauthorized and/or unlawful disclosure by Employee in breach of this Agreement;

(B)   any item or data forming part of the Confidential Information that is lawfully known by Employee, without any obligation of confidentiality or other restriction on use or disclosure, prior to the provision of such information by Alliant;

(C)   any item or data that becomes available to Employee from a person who, to the best of his knowledge, is not prohibited from transmitting such information by a contractual, legal or fiduciary obligation to Alliant; or

(D)   any item or data that was or is independently developed by Employee without use of the Confidential Information.

(iv)   **Legal Process or Compulsion.** Employee may release Confidential Information as required to prosecute or defend any claim under this Agreement; provided however, that he shall take all reasonable steps necessary to avoid publicly disclosing Confidential Information, including filing documents and papers under seal. Employee may disclose Confidential Information pursuant to a valid order of a court or governmental agency with proper jurisdiction, or if such disclosure is required by law or regulation; provided that the information is disclosed only to the minimum extent necessary, and provided that, to the extent allowed by law, he shall give Alliant sufficient advance notice so that it may seek a protective order or employ other lawful means to avoid or limit disclosure.

(d)   **Use of Company Property, Intellectual Property, Trade Secrets, and Confidential Information Following Separation of Employment.** Upon separation of Employee's employment with Alliant for any reason, Employee shall: (i) cease and not thereafter commence use of any Confidential Information or Intellectual Property (including without limitation, any patent, invention, copyright, Alliant Trade Secrets, trademark, trade name, logo, domain name or other source indicator) owned or used by Alliant, its subsidiaries or Affiliates; (ii) immediately return to Alliant, all originals and copies in any form or medium (including memoranda, books, papers, plans, computer files, letters, and other data) in Employee's possession or control (including any of the foregoing stored or located in Employee's office, home, laptop or other computer, whether or not Alliant property) that contain Confidential Information or Alliant Trade Secrets, except that Employee may retain only those portions of any personal notes, notebooks, and diaries that do not contain any Confidential Information or Alliant Trade Secrets; and (iii) notify and fully cooperate with Alliant regarding the delivery or destruction of any other Confidential Information or Alliant Trade Secrets of which Employee is or becomes aware. Nothing in this Section 9(d) precludes Employee from announcing a change of his employment to his customers or clients.

(e)   **Non-Solicitation.**

(i)   **Customers.**

(A)   **Employment Period.** In order to protect Alliant's Trade Secrets and Confidential Information, and consistent with Employee's agreements to act in

Confidential                                                                    ALLIANT00064322

good faith and exclusively for the benefit of Alliant, while employed by Alliant or any of its Affiliates, Employee shall not, whether on his own behalf or on behalf of any person, firm, partnership, association, corporation or business organization, entity or enterprise (other than Alliant or one of its Affiliates) solicit, or attempt to solicit Customers or Prospective Customers on behalf of a Competing Business, or induce or attempt to induce Customers, Prospective Customers, or suppliers of Alliant, or any of its Affiliates, to discontinue business with Alliant or any of its Affiliates, or knowingly to interfere with the relationship between any Customer, Prospective Customer, or supplier, or any other business relation and Alliant or any of its Affiliates.

(B)   **Post-Employment Restricted Period.**  In order to further protect Alliant's Trade Secrets and Confidential Information, and for other valuable consideration, during the Restricted Period, Employee shall not, on Employee's own behalf or on behalf of any person, firm, partnership, association, corporation or business organization, entity or enterprise: (i) solicit, or attempt to solicit, Customers of Alliant or any of its Affiliates for the purpose of performing or supervising the performance of insurance and benefits services of the type sold or provided by Employee while he was employed by Alliant or any of its Affiliates; (ii) induce or attempt to induce the termination, non-renewal or diminishment of any Business to any such Customers or any suppliers of Alliant or any of its Affiliates, or knowingly interfere with any relationship between any such Customer, supplier, or any other business relation and Alliant or any of its Affiliates.  This restriction shall apply only to those Customers or suppliers of Alliant or any of its Affiliates with whom Employee had contact or made contact, or about whom Employee obtained Confidential Information or Trade Secrets, within the course of Employee's employment with Alliant or an Affiliate of Alliant within the 24-month period immediately preceding the beginning of the Restricted Period.  Nothing herein is intended to diminish any existing or later-enacted statutory protections afforded to Trade Secrets or other proprietary information.  The Parties expressly agree that all such statutory protection will be given full force and effect for so long as any covered information qualifies for such protection.

(C)   **Restricted Period Tolling.**  The Restricted Period shall be tolled during any litigation, arbitration, or similar proceeding relating to the enforceability of this provision.  This provision shall only be enforced to the extent allowed by Applicable Law.

(ii)   **Employees.**

(A)   **Employment Period.**  While employed by Alliant or any of its Affiliates, Employee shall not, either directly or indirectly, except in the interest of Alliant or any of its Affiliates, call on, solicit, or attempt to induce any other officer, employee, or independent contractor of Alliant, or any of its Affiliates, to terminate his or her employment or relationship with Alliant, or any such Affiliate, and shall not assist any other person or entity in such a solicitation (regardless of whether any such officer, employee, or independent contractor would commit a breach of contract by terminating his or her employment).

(B)   **Post-Employment Restricted Period.**  During the Restricted Period, Employee shall not, either directly or indirectly, call on, solicit, or attempt to induce any person who is, or during the 12 month period immediately preceding the beginning of the Restricted Period was, an officer, employee, or independent contractor of Alliant, or any of its Affiliates, with whom Employee had contact or

made contact within the course of Employee's employment with Alliant or an Affiliate of Alliant for the purpose of soliciting or servicing Customers in the 24-month period immediately preceding the beginning of the Restricted Period, to terminate his or her employment or relationship with Alliant, or any of its Affiliates, and shall not assist any other person or entity in such a solicitation (regardless of whether any such officer, employee, or independent contractor would commit a breach of contract by terminating his or her employment). Nothing in this Agreement prohibits Employee from hiring an individual who responds to a job posting made available to the general public so long as Employee does not solicit or otherwise initiate such contact during the Restricted Period.

(C)  **Restricted Period Tolling.** The Restricted Period shall be tolled during any litigation, arbitration, or similar proceeding relating to the enforceability of this provision. This provision shall only be enforced to the extent allowed by Applicable Law.

**(iii)**  Notwithstanding the above, the post-employment restrictions in this Section 9(e) shall not apply to employees involuntarily terminated without Cause.

**(f)**  **Reasonable and Continuing Obligations.** Employee agrees that his obligations under this Section 9 are obligations that: (i) will continue beyond the date Employee's employment terminates; (ii) are reasonable, fair, and equitable in scope, time, and duration; (iii) are necessary to protect Alliant's legitimate business interests; and (iv) are a material inducement to Alliant to enter into this Agreement.

**(g)**  Scope of Covenants. Alliant and Employee acknowledge that the time, scope, geographic area, and other provisions of this Section 9 have been specifically negotiated by sophisticated parties, and agree that they each consider the restrictions and covenants contained herein to be reasonable and necessary for the protection of the interests of Alliant and its Affiliates, but if any such restriction or covenant is held by any court of competent jurisdiction to be void, but would be valid if deleted in part or reduced in application, such restriction or covenant will apply with such deletion or modification as may be necessary to make it valid and enforceable.

**10.**  **Remedy for Breach or Threatened Breach.** Employee acknowledges that the services to be rendered pursuant to this Agreement are of a special, unique, and extraordinary character, and that it would be difficult or impossible to replace such services or to compensate Alliant in monetary damages for a breach of the duty to provide the services under this Agreement. In addition, Employee acknowledges that Alliant's remedies at law for a breach or threatened breach of any of the provisions of Sections 2 or 9 would be inadequate, and Alliant would suffer irreparable damages as a result of such breach or threatened breach. Accordingly, Employee agrees that if he violates any provision of Sections 2 or 9, Alliant will be entitled to specific performance of these covenants, including entry of a temporary restraining order in state or federal court, preliminary and permanent injunctive relief, an *ex parte* seizure order that is necessary to prevent the propagation or dissemination of Alliant Trade Secrets, or other appropriate judicial remedy, writ, or order. These equitable remedies are in addition to any other legal remedies, damages, and expenses that Alliant may be entitled to recover. Alliant agrees to give Employee and, if known, Employee's attorney, notice of any legal proceeding, including any application for a temporary restraining order, made pursuant to this section. Employee acknowledges that the covenants in Section 9 shall be construed as agreements independent of any other provision of this Agreement or any other agreement between Alliant and Employee, and such covenants shall be independently enforceable whether predicated upon this Agreement or any other agreement, and the invalidity of this Agreement or other agreement(s)

**Alliant**
Employment Agreement                    Page 13 of 19                    Initials_ GW

shall not constitute a defense to the enforcement by Alliant of such covenants.

**11.** **No Conflict of Interest.** During the period of Employee's employment, he must not engage in any work, paid or unpaid, that creates an actual, potential, or perceived conflict of interest with Alliant. This type of work will include, but is not limited to, directly or indirectly competing with Alliant in any way, or acting as an officer, director, employee, consultant, stockholder, volunteer, lender, or agent of any business enterprise of the same nature as, or that is in direct competition with, the Business or any other business in which Alliant is now engaged or in which Alliant becomes engaged during the term of Employee's employment, as may be determined by Alliant in its sole discretion. If Alliant believes such a conflict exists, Alliant may ask Employee to choose to discontinue the other work or resign employment with Alliant. In addition, during the term of Employee's employment, Employee agrees not to refer any Customer or Prospective Customer to a Competing Business without obtaining Alliant's prior written consent. The foregoing is not intended to restrict or prohibit Employee's ownership of stock or other securities of a publicly-held corporation in which Employee does not (a) possess beneficial ownership of more than 5% of the voting capital stock of such corporation, or (b) participate in any management or advisory capacity.

**12.** **Compliance with Orders, Judgments, and Injunctions.** Employee represents and warrants to Alliant that the execution, delivery, and performance of this Agreement will not conflict with, nor result in the violation or breach of, any term or provision of any order, judgment, or injunction to which Employee is a party or by which he is bound including, without limitation, any order, judgment or injunction restricting the sale of products similar to Alliant's products in any geographic location or otherwise. Employee acknowledges that Alliant is relying on his representation and warranty in entering into this Agreement, and Employee agrees to indemnify Alliant from and against all claims, demands, causes of action, damages, costs or expenses (including reasonable attorneys' fees) arising from any breach of this representation and warranty. Notwithstanding the above, Employee and Alliant acknowledge that Employee has provided his employment agreements to, and discussed his compensation package with his former employer with, Alliant, and neither Party believes such is a breach of any obligations he has to his former employer or to Alliant pursuant to this Agreement.

**13.** **Indemnity and Assignment of Claims.**

**(a)** Provided that Employee has complied with all material terms of this Agreement and all Applicable Law, Alliant shall indemnify, hold Employee harmless, and provide him with a defense with respect to any civil claim, lawsuit, or other legal proceeding, including any and all damages, claims, fees, expenses, costs and charges, including reasonable attorneys' fees and court costs (collectively, ***"Claims"***) brought against him arising out of or related to the termination of his employment with his latest employer preceding his employment with Alliant (***"Former Employer"***). References to Former Employer include any Affiliate of Former Employer with which Employee was employed immediately prior to the Effective Date. Notwithstanding the foregoing, Alliant shall have no indemnification obligations under this Agreement, or otherwise, with respect to any breach by Employee of his obligations to Former Employer with respect to theft or misappropriation of its trade secret, confidential, or proprietary information. Alliant shall not take any action that would impair Employee's right to indemnification, other than in connection with a claim by Alliant that Employee is not entitled to indemnification in accordance with the standards set forth in this Section 13.

**(b)** Alliant agrees to indemnify and provide Employee a defense with respect to any Claims brought against him as a result of any act or omission by him directly arising out of the discharge of his duties for Alliant, or Employee's obedience to Alliant's directions, unless at the time of obeying such directions, he believed Alliant's directions to be unlawful. Employee expressly understands and agrees that, except as otherwise provided in this Agreement,

**Alliant**
**Employment Agreement**                     Page 14 of 19                          Initials _GW_

Alliant is not obligated to indemnify or provide him a defense with respect to any Claims that are finally judicially determined to have resulted from Employee's unlawful conduct, or conduct occurring outside the course and scope of his employment or duties for Alliant, and/or conduct occurring prior to the date of his employment with Alliant, or after his separation of employment with Alliant.

(c) Employee hereby confirms, represents, and warrants he has not misappropriated, acquired, used, disclosed, or removed from Former Employer any materials or information of Former Employer that may reasonably be deemed trade secrets, confidential, or proprietary in nature without the advance permission of the Former Employer. Alliant's indemnity obligations hereunder are conditioned upon this confirmation, representation, and warranty by Employee and adherence to the terms of this Agreement and Applicable Law.  Employee further expressly understands and agrees that, with respect to its performance of its indemnity obligations under this Section 13, Alliant has the exclusive right to select counsel for Employee, make any decisions concerning settlement or other resolution of the matter, and otherwise control Employee's defense of Claims brought against Employee; provided, however, that in the event a conflict of interest exists between the Parties that cannot be resolved via mutual waivers, the Parties shall mutually select new, independent counsel to solely represent Employee at Alliant's expense.

(d) In consideration of entering into this Agreement and Alliant's agreement to indemnify Employee for litigation expenses relating to the termination of his employment with his Former Employer pursuant to this Section 13, Employee agrees to assign and hereby assigns to Alliant all personal claims, rights, causes of action and demands of whatever nature, whether known or unknown, Employee has or may have against his Former Employer.  Notwithstanding the above, Employee does not assign his (i) rights, title, interest or obligations in, to or under claims for declaratory relief concerning Employee's own continuing obligations to Employee's former employers, (ii) claims for unfair competition against Employee's former employers, or (iii) claims related to Employee's prior employment that cannot be assigned as a matter of law.

14. **AGREEMENT TO ARBITRATE**.

(a) **COVERED CLAIMS.  EXCEPT FOR THE PARTIES' RESPECTIVE RIGHTS TO SEEK INJUNCTIVE RELIEF, EX PARTE SEIZURE ORDERS, OR OTHER EQUITABLE RELIEF AS ALLOWED HEREIN OR BY LAW, TO THE FULLEST EXTENT PERMITTED BY LAW, EMPLOYEE AND ALLIANT AGREE TO ARBITRATE UNDER THE FEDERAL ARBITRATION ACT ("FAA") ANY CONTROVERSY, CLAIM, OR DISPUTE BETWEEN THEM ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, INCLUDING THE INTERPRETATION, VALIDITY, AND ENFORCEABILITY OF THIS SECTION 14, THE EMPLOYMENT RELATIONSHIP BETWEEN THEM, OR ANY DISPUTES UPON TERMINATION OF EMPLOYMENT INCLUDING, BUT NOT LIMITED TO, BREACH OF CONTRACT, TORT, DISCRIMINATION, HARASSMENT, WRONGFUL TERMINATION, DEMOTION, DISCIPLINE, FAILURE TO ACCOMMODATE, FAMILY AND MEDICAL LEAVE, COMPENSATION OR BENEFITS CLAIMS, CONSTITUTIONAL CLAIMS, AND ANY CLAIMS FOR VIOLATION OF ANY LOCAL, STATE, OR FEDERAL LAW, STATUTE, REGULATION OR ORDINANCE, OR COMMON LAW.  THE FAA APPLIES TO THIS AGREEMENT BECAUSE THE COMPANY'S BUSINESS INVOLVES INTERSTATE COMMERCE.  THE PARTIES FURTHER AGREE THAT ARBITRATION IS THEIR ONLY RECOURSE FOR SUCH CLAIMS AND HEREBY WAIVE THE RIGHT TO PURSUE SUCH CLAIMS IN ANY OTHER FORUM, UNLESS OTHERWISE REQUIRED BY LAW.  FOR THE PURPOSE OF THIS AGREEMENT TO ARBITRATE, REFERENCES TO "ALLIANT" INCLUDE ALLIANT AND ALL OF ITS AFFILIATES, PARENT, SUBSIDIARY, AND RELATED ENTITIES, ALL OF THEIR EMPLOYEES, SUPERVISORS, OFFICERS,**

*Alliant*
**Employment Agreement**　　　　　　　　　Page 15 of 19　　　　　　　　Initials___ GW

DIRECTORS, AGENTS, PENSION AND BENEFIT PLANS, PENSION AND BENEFIT PLAN SPONSORS, FIDUCIARIES AND ADMINISTRATORS, AND ALL SUCCESSORS AND ASSIGNS OF ANY OF THEM, AND THIS ARBITRATION AGREEMENT SHALL APPLY TO THEM TO THE EXTENT EMPLOYEE'S CLAIMS ARISE OUT OF OR RELATE TO THEIR ACTIONS ON BEHALF OF ALLIANT.___ [Initial]

(b) WAIVER OF CLASS ACTION. ALL CLAIMS BROUGHT UNDER THIS BINDING ARBITRATION AGREEMENT SHALL BE BROUGHT IN THE INDIVIDUAL CAPACITY OF THE EMPLOYEE OR ALLIANT. THIS BINDING ARBITRATION AGREEMENT SHALL NOT BE CONSTRUED TO ALLOW OR PERMIT THE CONSOLIDATION OR JOINDER OF OTHER CLAIMS OR CONTROVERSIES INVOLVING ANY OTHER EMPLOYEES, OR PERMIT SUCH CLAIMS OR CONTROVERSIES TO PROCEED AS A CLASS ACTION, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, OR ANY SIMILAR REPRESENTATIVE ACTION. NO ARBITRATOR SHALL HAVE THE AUTHORITY UNDER THIS AGREEMENT TO ORDER ANY SUCH CLASS OR REPRESENTATIVE ACTION. ANY DISPUTE REGARDING THE SCOPE OR ENFORCEABILITY OF THIS AGREEMENT SHALL BE RESOLVED BY A COURT, NOT BY THE ARBITRATOR. BY SIGNING THIS AGREEMENT, EMPLOYEE AGREES TO WAIVE ANY SUBSTANTIVE OR PROCEDURAL RIGHTS THAT EMPLOYEE MAY HAVE TO BRING AN ACTION ON A CLASS, COLLECTIVE, PRIVATE ATTORNEY GENERAL, REPRESENTATIVE OR OTHER SIMILAR BASIS. _GW_ [Initial]

DUE TO THE NATURE OF THIS CLASS ACTION WAIVER, ALLIANT HAS PROVIDED EMPLOYEE WITH THE ABILITY TO OPT OUT OF THE CLASS ACTION WAIVER SET FORTH IN THIS SECTION 14(b). ACCORDINGLY, EMPLOYEE ACKNOWLEDGES AND UNDERSTANDS THAT HIS AGREEMENT TO WAIVE THE RIGHT TO PURSUE OR PARTICIPATE IN THE CONSOLIDATION OR JOINDER OF OTHER CLAIMS OR CONTROVERSIES INVOLVING ANY OTHER EMPLOYEES OR PARTIES, OR HAVE SUCH CLAIMS OR CONTROVERSIES PROCEED ON A CLASS OR COLLECTIVE ACTION, IS VOLUNTARY AND THAT EXECUTION OF SUCH WAIVER IS NOT A CONDITION OF EMPLOYMENT. EMPLOYEE UNDERSTANDS HE MAY ELECT TO OPT OUT OF THE CLASS ACTION WAIVER AND RETAIN ANY RIGHTS HE MAY HAVE TO BRING AN ACTION IN COURT AND BRING AN ACTION ON A CLASS OR COLLECTIVE BASIS BY SENDING AN E-MAIL TO CONTRACTSADMINISTRATION@ALLIANT.COM CLEARLY AND UNAMBIGUOUSLY INDICATING THAT HE OPTS OUT OF THE CLASS ACTION WAIVER CONTAINED WITHIN THIS AGREEMENT. CORRESPONDENCE MUST BE RECEIVED WITHIN THIRTY DAYS OF EXECUTION OF THIS AGREEMENT AND, IF NOT, THE PARTIES AGREE THAT THE CLASS ACTION WAIVER IS BINDING.

(c) CONSIDERATION. THE COMPENSATION AND BENEFITS PROVIDED UNDER THIS AGREEMENT AND THE MUTUAL PROMISE BY THE PARTIES TO ARBITRATE ANY AND ALL DISPUTES BETWEEN THEM RATHER THAN LITIGATE THEM BEFORE THE COURTS OR OTHER BODIES PROVIDES THE CONSIDERATION FOR THIS AGREEMENT TO ARBITRATE. _GW_ [Initial]

(d) INITIATION OF ARBITRATION. EITHER PARTY MAY EXERCISE THE RIGHT TO ARBITRATE BY PROVIDING THE OTHER PARTY WITH WRITTEN NOTICE OF ANY AND ALL CLAIMS FORMING THE BASIS OF SUCH RIGHT IN SUFFICIENT DETAIL TO INFORM THE OTHER PARTY OF THE SUBSTANCE OF SUCH CLAIMS. IN NO EVENT SHALL THE REQUEST FOR ARBITRATION BE MADE AFTER THE DATE WHEN THE INSTITUTION OF LEGAL OR EQUITABLE PROCEEDINGS BASED ON SUCH CLAIMS WOULD BE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS. EMPLOYEE CAN INITIATE ARBITRATION BY TIMELY SERVING OR MAILING A WRITTEN NOTICE TO: GENERAL COUNSEL OF ALLIANT AT 701 B STREET, 6TH FLOOR, SAN DIEGO,

Confidential                                                                        ALLIANT00064327

<u>CA 92101</u>. ALLIANT MAY INITIATE ARBITRATION BY TIMELY SERVING OR MAILING A WRITTEN NOTICE TO EMPLOYEE AT THE LAST ADDRESS RECORDED IN HIS PERSONNEL FILE. ANY NOTICE OF ARBITRATION THAT IS SERVED BY MAIL SHALL NOT BE DEEMED COMPLETE UNTIL FIVE DAYS AFTER THE POSTMARKED DATE. $GW$ [Initial]

(e) <u>ARBITRATION PROCEDURE</u>. THE ARBITRATION WILL BE CONDUCTED BY A SINGLE MUTUALLY ACCEPTABLE NEUTRAL ARBITRATOR FROM JAMS, THE RESOLUTION EXPERTS ("JAMS") AND, UNLESS OTHERWISE AGREED TO BY THE PARTIES IN WRITING, WILL FOLLOW THE PROCEDURAL AND EVIDENTIARY RULES SET FORTH IN THE JAMS EMPLOYMENT ARBITRATION RULES & PROCEDURES (EFFECTIVE JULY 1, 2014) ATTACHED HERETO AS <u>EXHIBIT D</u>. THE ARBITRATION WILL BE HELD IN A MUTUALLY AGREED UPON LOCATION. THE PARTIES ARE ENTITLED TO REPRESENTATION BY ATTORNEYS OR OTHER REPRESENTATIVES OF THEIR CHOOSING. ALLIANT SHALL PAY THE ARBITRATOR'S FEE, AND WILL BEAR ALL OTHER ADMINISTRATIVE CHARGES BEYOND THOSE THAT EMPLOYEE WOULD HAVE OTHERWISE HAD TO PAY IF A LAWSUIT HAD BEEN FILED IN COURT. THE ARBITRATOR SHALL HAVE THE POWER TO ENTER ANY AWARD THAT COULD BE ENTERED BY A JUDGE OF THE TRIAL COURT OF THE STATE OF COLORADO OR U.S. DISTRICT COURT, AND ONLY SUCH POWER, AND SHALL ISSUE A WRITTEN AND SIGNED DECISION THAT SETS FORTH THE FINDINGS OF FACT AND CONCLUSIONS OF LAW UPON WHICH THE DECISION IS BASED. THE ARBITRATOR SHALL FOLLOW THE LAW AND, EXCEPT AS OTHERWISE PROVIDED HEREIN, SHALL HAVE NO POWER TO ALTER, MODIFY, IGNORE, OR OTHERWISE DEVIATE FROM THE EXPRESS TERMS OF THIS AGREEMENT. THE PARTIES AGREE TO ABIDE BY AND PERFORM ANY AWARD RENDERED BY THE ARBITRATOR. JUDGMENT ON THE AWARD MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF, SUBJECT TO THE LIMITED JUDICIAL REVIEW PROVIDED FOR BY APPLICABLE STATE LAW. $GW$ [Initial]

(f) <u>ENFORCEABILITY</u>. THIS AGREEMENT TO ARBITRATE WILL BE SPECIFICALLY ENFORCEABLE UNDER THE PREVAILING ARBITRATION LAWS, AND WILL BE IN ACCORDANCE WITH THE ATTACHED JAMS EMPLOYMENT ARBITRATION RULES & PROCEDURES (EFFECTIVE JULY 1, 2014) ESTABLISHED FOR ARBITRATION. THE PARTIES UNDERSTAND THAT BY AGREEING TO ARBITRATE THEIR DISPUTES, THEY ARE GIVING UP THEIR RIGHT TO HAVE THEIR DISPUTES HEARD IN A COURT OF LAW AND, IF APPLICABLE, BY A JURY. $GW$ [Initial]

(g) <u>ACKNOWLEDGMENT OF RECEIPT OF JAMS EMPLOYMENT ARBITRATION RULES & PROCEDURES (EFFECTIVE JULY 1, 2014) AND CONSENT TO ARBITRATION PROVISION</u>. EMPLOYEE HEREBY ACKNOWLEDGES THAT HE HAS BEEN GIVEN A COPY OF THE ATTACHED JAMS EMPLOYMENT ARBITRATION RULES & PROCEDURES (EFFECTIVE JULY 1, 2014), AND HAS REVIEWED THEM PRIOR TO THE SIGNING OF THIS AGREEMENT. FURTHER, EMPLOYEE HEREBY CONSENTS, AS EVIDENCED BY EMPLOYEE'S INITIALS TO THE AGREEMENT, TO ARBITRATE UNDER THE TERMS AND CONDITIONS SET FORTH IN THIS AGREEMENT. EMPLOYEE ACKNOWLEDGES THAT HE HAS HAD THE OPPORTUNITY TO HAVE SUCH ARBITRATION PROVISION, AND EACH OF ITS TERMS, REVIEWED BY AN ATTORNEY OR OTHER REPRESENTATIVE OF EMPLOYEE'S CHOOSING. $GW$ [Initial]

(h) <u>INJUNCTIVE RELIEF & SECTION 9 RIGHTS</u>. NOTHING IN THIS <u>SECTION 14</u> IS INTENDED TO (NOR DOES) WAIVE OR AFFECT THE RIGHTS OF ALLIANT OR ITS AFFILIATES TO SEEK RELIEF IN THE STATE OR FEDERAL COURTS FOR

Confidential                                                          ALLIANT00064328

**BREACHING OR THREATENED BREACHES BY EMPLOYEE OF <u>SECTION 9</u>.  THIS AGREEMENT IS NOT INTENDED TO INTERFERE WITH RIGHTS TO COLLECTIVELY BARGAIN, TO ENGAGE IN PROTECTED, CONCERTED ACTIVITY, OR TO EXERCISE OTHER RIGHTS PROTECTED UNDER THE NATIONAL LABOR RELATIONS ACT, AND EMPLOYEE WILL NOT BE SUBJECT TO DISCIPLINARY ACTION OF ANY KIND FOR OPPOSING THE ARBITRATION PROVISIONS OF THIS AGREEMENT.**

15. <u>Miscellaneous</u>.

   (a) <u>Attorneys' Fees</u>.  Except as otherwise provided in this Agreement, each side will bear his/its own attorneys' fees in any dispute, unless an award of attorneys' fees to the prevailing party is authorized by Applicable Law.

   (b) <u>Governing Law; Venue</u>.  The validity, construction, enforcement, and performance of this Agreement shall be governed by the Federal Arbitration Act and the laws of the State of Colorado, without regard for any conflicts of law analysis, and any claims for misappropriation of Alliant Trade Secrets may also be brought under the Defend Trade Secrets Act of 2016 (18 U.S.C. §§ 1831-1836).  Except as otherwise covered by the Parties' agreement to arbitrate disputes as set forth herein, each party consents to the exclusive jurisdiction of the state and federal courts in Colorado in any action, suit, or proceeding arising out of or relating to this Agreement and Employee waives any objection to venue or on the grounds of forum non conveniens.

   (c) <u>Severability</u>.  If an arbitrator or court of competent jurisdiction determines that a provision in this Agreement is unenforceable, that provision will be modified to the extent necessary to allow enforceability, as revised.  If the arbitrator or court deems modification not legally permissible or practicable, the unenforceable provision will be deleted without impacting or diminishing the validity and enforceability of the remaining provisions.

   (d) <u>Amendment and Waiver</u>.  Except as otherwise provided herein, this Agreement may be amended or modified only by a writing executed by Employee and a member of Alliant's Executive Committee. No waiver by either party of a breach of any provision of this Agreement shall be construed as a waiver of any subsequent or different breach, and no forbearance by a party to seek a remedy for non-compliance or breach by the other party shall be construed as a waiver of any right or remedy with respect to such non-compliance or breach.

   (e) <u>Binding Effect</u>. Alliant's rights and obligations under this Agreement will inure to the benefit of and will be binding upon its successors and assigns.  Employee may not assign any of his rights or obligations under this Agreement.

   (f) <u>Notice</u>.  All notices, requests, and other communications given under this Agreement, must be in writing and deemed duly given: (i) when delivered personally to the recipient; (ii) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid); or  (iii) five business days after being sent by U.S. certified mail (charges prepaid).  Except as otherwise provided herein or directed by a party in writing, all notices, requests or communications under this Agreement shall be addressed to the intended recipient as set forth below:

   **If to Alliant:**  Alliant Insurance Services, Inc., 701 B Street, 6th Floor, San Diego, CA 92101, marked "Attention: General Counsel."

   **If to Employee:**  To Employee's most recent address set forth in Alliant's personnel records, with a copy to his designated counsel, if any.

Confidential                                                                                                ALLIANT00064329

(g) <u>Cooperation</u>. Employee shall provide Alliant with his reasonable cooperation in connection with any action or proceeding (or any appeal from any action or proceeding) that relates to events occurring during Employee's employment hereunder.

(h) <u>Interpretation; Construction</u>. The headings contained in this Agreement are for reference purposes only and shall not be used in interpreting this Agreement. Employee acknowledges that he has had an opportunity to review and revise the Agreement and to seek independent legal advice from his attorney(s), if desired. Therefore, any rule of construction that construes ambiguities against the drafting party shall not be employed in the interpretation of this Agreement.

(i) <u>Entire Agreement</u>. This Agreement, together with its exhibits, all of which are expressly incorporated by reference as if fully set forth herein, comprise the only agreement and understanding between the Parties pertaining to this Agreement's subject matter and supersedes all prior or simultaneous representations, discussions, negotiations and agreements, whether written or oral, concerning Employee's employment with Alliant.

(j) <u>Survival</u>. Except as otherwise provided in this Agreement, <u>Sections 7</u> ("Right to Terminate Employment; Rights upon Termination of Employment"), <u>8</u> ("Section 409A"), <u>9</u> ("Covenants by Employee"), <u>10</u> ("Remedy for Breach or Threatened Breach"), <u>12</u> ("Compliance with Orders, Judgments, and Injunctions"), <u>13</u> ("Indemnity and Assignment of Claims"), <u>14</u> ("Agreement to Arbitrate"), and <u>15</u> ("Miscellaneous") will survive this Agreement's termination, regardless of the date, cause, or manner of such termination.

THE PARTIES HAVE READ AND FULLY UNDERSTAND EACH AND EVERY PROVISION CONTAINED IN THIS AGREEMENT.

EMPLOYEE

By: _____

Printed Name: <u>Gregory Winter</u>

ALLIANT INSURANCE SERVICES, INC.

By: _____

Title: _____

<u>**Alliant**</u>
**Employment Agreement**

Page 19 of 19

Initials <u>GW</u>

**Exhibit A to**
**Employment Agreement**

**COMPENSATION**

1. **Definitions**. In addition to the definitions set forth in the Agreement, the following definitions apply in this Exhibit A:

   (a) **"Net Commissions and Fees"** is defined as gross commissions and fees, *minus* (i) return commissions and fees resulting from cancellations, rescissions or rebates; *minus* (ii) any co- or sub- brokerage commissions and fees, and general agent overrides to agents, brokers, or broker-dealers (regardless of affiliation); *plus or minus* (iii) commissions and fees resulting from audits; provided, however, that Net Commissions and Fees shall not include any interest income or any profit sharing, bonus, contingent, supplemental, override, or preferred brokerage commissions and fees.

   (b) **"Small Lines"** is defined as any new or renewal Account that generates less than $5,000 in annual Net Commissions and Fees.

   (c) **"Split Code"** is defined as the customer code that determines which producer(s) will be eligible to receive commissions on the Net Commissions and Fees for a particular Customer or a particular product line.

   (d) **"Vested Producer"** is defined as the producer whom Alliant designates as having originated an Account, by issuing the initial policy or other business on that Account, or who has been assigned vesting on that Account by Alliant or through assignment of "vesting" by Alliant upon the recommendation of the prior Vested Producer on that Account. In the event there is no specific vesting code assigned to an Account, that vesting will be determined by the most recent commission split.

   (e) **"Vested Accounts"** is defined as those Accounts for which Employee is designated by Alliant, in Alliant's sole discretion, as the Vested Producer.

2. **Signing Bonus.** During his first year of employment with Alliant, Employee will be eligible to receive a one-time cash signing bonus of $300,000, less applicable withholdings. Alliant shall pay this bonus to Employee no later than 30 days after the full execution of this Agreement, provided that Employee is still employed by Alliant as of this payment date. Notwithstanding the payment date, this bonus will be earned over the 36-month period following the Effective Date. If, during this 36-month period, Employee terminates his employment for his convenience or Alliant terminates his employment for Cause, then Employee shall be required to repay the unearned portion of this bonus. The unearned portion will be calculated by dividing the total bonus amount by 1,095 days, and multiplying the quotient by the number of days remaining in that 36-month period. If, during his first 36 months of employment, Alliant terminates Employee without Cause, Employee will not be required to repay any portion of this bonus. Nothing in this Section 2 is intended to alter Employee's at-will status.

3. **Base Annual Salary.**

   (a) **Years 1 through 3.** For the first three years of his employment, Alliant shall pay Employee a base salary (**"Base Salary"**) at an annual rate of $300,000. Employee's Base Salary will be subject to all applicable withholdings and shall be payable by Alliant in regular bi-weekly installments in accordance with Alliant's customary payroll practices. In the event Employee's employment under this Agreement is terminated by either party for any reason,

Confidential                                                                    ALLIANT00064331

Employee's Base Salary will be prorated to the effective date of termination.

    **(b)** <u>**Year 4 and Onward.**</u>  For the fourth year of his employment and his subsequent employment years, Employee's Base Salary will be determined and memorialized by the Parties in writing prior to the date on which any new Base Salary amount becomes effective.

**4.** <u>**Commissions.**</u>

    **(a)** <u>**Earning of Commissions**</u>.  At the rates set forth in the Personal Commission Schedule below, Employee will be eligible to earn a commission (*"**Personal Commission(s)**"*) on the Net Commissions and Fees Alliant receives for new or renewal Business on Accounts for which Alliant designates Employee in the Split Code as a Vested Producer in accordance with company policy. In the event there is no specific vesting code assigned to an Account, that vesting will be determined by the most recent commission split.  The Personal Commission on that Account will be earned on the date that the Net Commissions and Fees are received by Alliant.  To earn the Personal Commission, Employee also must be employed by Alliant on the date that the Net Commissions and Fees are actually received by Alliant, or have terminated employment with Alliant no earlier than 30 days prior to such date. Employee will not earn Personal Commissions on uncollected premiums, returned premiums, or on Business that is not accepted by Alliant and the appropriate insurance company or companies.

    **(b)** <u>**Personal Commission Schedule**</u>.  Employee's Personal Commission rates will be as follows:

### PERSONAL COMMISSION SCHEDULE

| <u>Product Line</u> | <u>New Business Rate</u> | <u>Renewal Business Rate</u> |
|---|---|---|
| Small Lines | 0.00% | 0.00% |
| P&C Commercial Lines | 30.00% | 30.00% |
| Surety | 30.00% | 30.00% |
| Group Life/Health | 30.00% | 30.00% |
| Individual Life/Health | 30.00% | 30.00% |
| Voluntary Benefits | 30.00% | 30.00% |

    **(c)** <u>**Split Commissions**</u>.  On Accounts where more than one producer is identified in the Split Code, the Personal Commissions will be divided among Employee and such other producer(s) as provided under (i) the prevailing Alliant Cross-Selling Policy, where applicable, or (ii) the specific percentage mutually agreed to in writing by all producers on that Account, subject to Alliant's final approval.

    **(d)** <u>**Reconciliation of Return Premiums**</u>.  Employee understands and agrees that he has substantial duties that are unique to the insurance industry, including servicing Customers and Accounts throughout the policy periods to ensure Customer retention and to prevent the cancellation of Accounts and Business.  Employee further understands and agrees that within the insurance industry, a commission carries with it an attendant obligation to refund a pro rata share of that commission if the premium is subsequently refunded to the insured. Employee expressly understands and agrees that commissions on return premiums shall be reconciled against Employee's future earned Personal Commissions, at return commission rates, in accordance with the Personal Commission Schedule.

    **(e)** <u>**Commission Accounting**</u>.  Alliant shall give Employee an accounting of all Personal

*Alliant*
**Employment Agreement**
**Exhibit A – Compensation**

Initials _GW_

ALLIANT00064332

Commissions earned and payable to him by the 15th day of each month for Business of the preceding month. Each month, no later than 15 days after this accounting is completed and delivered to Employee, Alliant shall pay Employee the Personal Commissions reflected in such accounting that remain payable to Employee, subject to all applicable withholdings.

(f) <u>Termination</u>. Upon the termination of employment for any reason, Employee will be paid all Personal Commissions earned as of the termination date. Employee will also receive Personal Commissions on Net Commissions and Fees received by Alliant during the first 30 days following the termination date, subject to commission earning provisions set forth above, and reconciliation against returned premiums and outstanding advances. All Personal Commissions paid to Employee will be less applicable withholdings.

5. **Modification**. Alliant expressly reserves the right to modify Employee's compensation set forth in this <u>Exhibit A</u> at any time on a prospective basis. Modifications to this <u>Exhibit A</u> will become effective only upon advance written notice to Employee and will be deemed given if delivered in hard copy or electronic form.

SO AGREED:

_____
Gregory Winter

*Alliant*
**Employment Agreement**
**Exhibit A – Compensation**                    Page 3 of 3                    Initials_____

**Exhibit B to**
**Employment Agreement**

**LIST OF RETAINED INTELLECTUAL PROPERTY**

The following is a list of all Intellectual Property that, as of the Effective Date, Employee has made or developed that relate in any way to any of Alliant's Business or proposed Business, products, services, or research and development, and that are not assigned to Alliant:

| Title of Retained Intellectual Property | Date | Description of Retained Intellectual Property |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Except as indicated in this Exhibit B, Employee has no Intellectual Property to disclose pursuant to Section 9(a)(ii) of the Agreement.

**EMPLOYEE:**

By: _____

Printed Name:  Gregory Winter

**Alliant**
**Employment Agreement**
**Exhibit B – List of Retained Intellectual Property**

ALLIANT00064334

**Exhibit C to**
**Employment Agreement**

**EQUITY**

All equity, regardless of type, is issued subject to consent by Alliant's Board of Directors, which will not be unreasonably withheld, and subject to tenure and performance requirements set forth in the governing documents effecting the issuance of equity. Any equity due "upon hire," regardless of type, shall be issued within 120 days of the full execution of this Agreement. Unless otherwise indicated in the equity governing documents, vesting periods for all equity commence on the "Grant Date" defined in the governing documents. In the event there is any conflict between the terms of this Agreement and the equity governing documents, the equity governing documents will control with respect to the issuing and vesting of equity.

<u>**Equity Award.**</u>

Upon hire, Employee will be eligible to receive an award of <u>10,000</u> Class B Units in Alliant Holdings, L.P. (the **"Equity Award"**). The Equity Award will vest in three equal annual installments over a three-year term, with one installment vesting on each of the first three anniversaries of the award's issuance date. In the event of a Change of Control (as defined in the equity governing documents and provided that such change of control constitutes a change of control under Section 409A of the Internal Revenue Code and regulations and guidance thereto) during this three-year vesting period, any unvested portion of the Equity Award will vest immediately prior to such Change of Control event, as further described in the equity governing documents.

<u>**Floor Value Bonus.**</u>

Alliant anticipates that, as of the conclusion of the five-year period that immediately follows the Equity Award's issuance date, any Class B Units granted in the Equity Award that are still held by Employee will be worth at least $10 per unit, subject to reduction by any prior distributions paid to Employee on such units and adjustment for any unit splits (in this exhibit, the term **"Floor Value"** refers to this anticipated per unit value after such reduction for any prior distributions paid and adjustment for any unit splits).

In the event that, as of the conclusion of the five-year period that immediately follows the Equity Award's issuance date, the actual value of each of these Class B Units (as determined by Alliant's Board of Directors in its sole discretion) is less than the Floor Value, then, subject to Employee's continued employment by Alliant through the conclusion of this five-year period, Alliant shall make a one-time cash payment to Employee in an amount equal to the positive difference, if any, between (a) the product of the number of Class B Units granted in the Equity Award that are still held by Employee *multiplied by* the Floor Value, and (b) the aggregate actual value of the Class B Units granted in the Equity Award that are still held by Employee.

*For example purposes only*, if as of the conclusion of this five-year period, Employee still holds all 10,000 B Units and the Floor Value is $10 and each unit's actual value is $9, Alliant would pay Employee a one-time cash payment equal to $10,000 ((10,000 units x $10 per unit) − (10,000 units x $9 per unit)).

**⟡Alliant**
**Employment Agreement**
**Exhibit C – Equity**

ALLIANT00064335

If any Floor Value cash payment is made pursuant to this Agreement, it will be subject to all applicable withholdings and will be paid to Employee no later than 60 days after the conclusion of the five-year period that immediately follows the Equity Award's issuance date.

**Alliant**
**Employment Agreement**
**Exhibit C – Equity**

**Exhibit D to**
**Employment Agreement**

**JAMS, THE RESOLUTION EXPERTS**
**ARBITRATION RULES**

**Alliant**
**Employment Agreement**
**Exhibit D – Arbitration Rules**



# JAMS EMPLOYMENT ARBITRATION RULES & PROCEDURES

JAMS provides arbitration and mediation services worldwide. We resolve some of the world's largest, most complex and contentious disputes, utilizing JAMS Rules & Procedures as well as the rules of other domestic and international arbitral institutions.

JAMS arbitrators and mediators are full-time neutrals who come from the ranks of retired state and federal judges and prominent attorneys. These highly trained, experienced ADR professionals are dedicated to the highest ethical standards of conduct.

Parties wishing to write a pre-dispute JAMS arbitration clause into their agreement should review the sample arbitration clauses on page 4. These clauses may be modified to tailor the arbitration process to meet the parties' individual needs.



Confidential

# TABLE OF CONTENTS

Case Management Fees. . . . . . . . . . . . . . . . . . . . . . .3

**Sample Clauses for Use in Employment
Dispute Resolution Programs and Contracts**

Sample Clause for Mediation Only . . . . . . . . . . . . . .4

Sample Clause for Mediation and Arbitration. . . . . . . .4

**JAMS Employment Arbitration
Rules & Procedures**

Rule 1.  Scope of Rules. . . . . . . . . . . . . . . . . . . . .5

Rule 2.  Party Self-Determination. . . . . . . . . . . . . .6

Rule 3.  Amendment of Rules  . . . . . . . . . . . . . . .6

Rule 4.  Conflict with Law . . . . . . . . . . . . . . . . . .6

Rule 5.  Commencing an Arbitration . . . . . . . . . . . .6

Rule 6.  Preliminary and Administrative Matters. . . . .7

Rule 7.  Number and Neutrality of Arbitrators;
Appointment and Authority
of Chairperson . . . . . . . . . . . . . . . . . . . . . .9

Rule 8.  Service . . . . . . . . . . . . . . . . . . . . . . . . .9

Rule 9.  Notice of Claims. . . . . . . . . . . . . . . . . . .11

Rule 10. Changes of Claims . . . . . . . . . . . . . . . . . .12

Rule 11. Interpretation of Rules and
Jurisdictional Challenges. . . . . . . . . . . . . .12

Rule 12. Representation. . . . . . . . . . . . . . . . . . . . .13

Rule 13. Withdrawal from Arbitration. . . . . . . . . . . .13

Rule 14. *Ex Parte* Communications  . . . . . . . . . . . . .13

Rule 15. Arbitrator Selection, Disclosures
and Replacement. . . . . . . . . . . . . . . . . . . .14

Rule 16. Preliminary Conference. . . . . . . . . . . . . . .16

Rule 17. Exchange of Information . . . . . . . . . . . . . .16

Rule 18. Summary Disposition of a Claim or Issue  . .17

Rule 19. Scheduling and Location of Hearing. . . . . .18

Rule 20. Pre-Hearing Submissions  . . . . . . . . . . . .18

Rule 21. Securing Witnesses and Documents
for the Arbitration Hearing. . . . . . . . . . . . .19

Rule 22. The Arbitration Hearing. . . . . . . . . . . . . . .19

Rule 23. Waiver of Hearing. . . . . . . . . . . . . . . . . . .21

Confidential

ALLIANT00064340

Rule 24. Awards . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rule 25. Enforcement of the Award . . . . . . . . . . . . 23

Rule 26. Confidentiality and Privacy . . . . . . . . . . . 23

Rule 27. Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Rule 28. Settlement and Consent Award . . . . . . . . 24

Rule 29. Sanctions. . . . . . . . . . . . . . . . . . . . . . . . 25

Rule 30. Disqualification of the Arbitrator
as a Witness or Party and
Exclusion of Liability . . . . . . . . . . . . . . . 25

Rule 31. Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Rule 32. Bracketed (or High-Low)
Arbitration Option. . . . . . . . . . . . . . . . . . 27

Rule 33. Final Offer (or Baseball)
Arbitration Option. . . . . . . . . . . . . . . . . . 27

Rule 34. Optional Arbitration Appeal Procedure . . . . 28

## Case Management Fees

JAMS charges a nominal Case Management Fee.
For arbitrations, the Case Management Fee is as follows:

**Hearing Length**                          **Fee**

1 to 3 days . . . . . . . . . . . . . . . $400 per party, per day
*(1 day is defined as 10 hours of professional time)*

Time in excess of
initial 30 hours . . . . . . . . . . . 10% of professional fees

JAMS neutrals set their own hourly, partial and full-day rates. For information on individual neutrals' rates and the Case Management Fee, please contact JAMS at 800.352.5267. The Case Management Fee structure is subject to change.

## Sample Clauses for Use in Employment Dispute Resolution Programs and Contracts

The following are basic sample clauses providing for mediation or arbitration in an employment contract. A variety of issues may affect the enforceability or effectiveness of these sample clauses; therefore, it is recommended that you review applicable law in your jurisdiction and consult experienced counsel for advice. The information contained herein should not be considered legal advice or legal opinion. For information about setting a case, call your local JAMS office at 800.352.5267.

### Sample Clause for Mediation Only

*Any controversy, dispute or claim arising out of or relating to this [contract] or breach thereof shall first be settled through good-faith negotiation [OR company employment program] [other]. If the dispute cannot be settled through negotiation [OR company employment program] [other], the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS.*

### Sample Clause for Mediation and Arbitration

*Any controversy, dispute or claim arising out of or relating to this [contract] or breach thereof shall first be settled through good-faith negotiation [OR company employment program] [other]. If the dispute cannot be settled through negotiation [OR company employment program] [other], the parties agree to attempt in good faith to settle the dispute by mediation administered by JAMS. If the parties are unsuccessful at resolving the dispute through mediation, the parties agree to [binding] arbitration administered by JAMS pursuant to its Employment Arbitration Rules & Procedures and subject to JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness. Judgment on the Award may be entered in any court having jurisdiction.*

All of the JAMS Rules, including the Employment Arbitration Rules set forth below, can be accessed at the JAMS website: **www.jamsadr.com/rules-clauses.**

Confidential

ALLIANT00064342