UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/27/2025

MARSH & MCLENNAN AGENCY, LLC,

        Plaintiff,

-against-

ALLIANT INSURANCE SERVICES, INC., JOHNNY OSBORNE, MARGAUX STONE, and RACHEL MURRAY,

        Defendants.

1:24-cv-9914-MKV

OPINION AND ORDER
GRANTING IN PART
AND DENYING IN PART
APPLICATION FOR
PRELIMINARY INJUNCTION

MARY KAY VYSKOCIL, United States District Judge:

    Before the Court is the application of Plaintiff Marsh & McLennan Agency, LLC ("MMA") for a preliminary injunction against Defendant Alliant Insurance Services, Inc. ("Alliant"), a competitor of MMA in the insurance brokerage and risk management industry, and Defendants Johnny Osborne, Margaux Stone, and Rachel Murray, former employees of MMA [ECF No. 14]. Osborne, who was employed by MMA in an important client-facing role, abruptly resigned and began working for Alliant. Stone and Murray, who were members of Osborne's team, followed suit. MMA alleges that Osborne, acting at "Alliant's direction," took "confidential client data" from MMA, "recruited his team," and solicited MMA clients to transfer their business to Alliant [ECF No. 1 ("Cmpl.") ¶ 3], in violation of Non-Solicitation and Confidentiality Agreements between MMA and its former employees (the "Agreement") [ECF Nos. 16-1, 16-2, 16-3]. MMA submits that "38 . . . clients were solicited and left within days of Mr. Osborne's resignation" [ECF No. 26 ("Tr.") at 13:3–4]. According to MMA, Alliant follows a "strategy," well-documented in litigation across the country, of "orchestrat[ing]" such "raids" of its "competitors' most valuable employees, . . . confidential information," and clients. Cmpl. ¶ 1; see id. ¶ 55.

1

MMA asserts: (1) a claim against Osborne for breach of the non-solicitation of clients provision of the Agreement, see Cmpl. ¶¶ 105–111; (2) claims against Osborne, Stone, and Murray for breach of the "non-servicing" provision of the Agreement, see Cmpl. ¶¶ 112–118; (3) a claim against Osborne for breach of the non-solicitation of employees provision of the Agreement, see Cmpl. ¶¶ 119–126; (4) a claim against Osborne for breach of the confidentiality provisions of the Agreement, see Cmpl. ¶¶ 127–133; (5) claims against Osborne and Alliant for misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 et seq., see Cmpl. ¶¶ 134–146; (6) a claim against Osborne for breach of fiduciary duty, see Cmpl. ¶¶ 147–152; (7) a claim against Alliant for aiding and abetting a breach of fiduciary duty, see Cmpl. ¶¶ 153–160; (8) a claim against Alliant for tortious interference with the Agreement, see Cmpl. ¶¶ 161–169; (9) claims against Alliant and Osborne for tortious interference with the Agreement, see Cmpl. ¶¶ 170–176; (10) claims against Alliant and Osborne for tortious interference with business relations, see Cmpl. ¶¶ 177–185; and, finally, (11) claims against Alliant and Osborne for conspiracy, see Cmpl. ¶¶ 186–190.

Shortly after filing the Complaint, MMA filed an application for a temporary restraining order and a preliminary injunction [ECF Nos. 14 ("Proposed Order"), 15 ("Pl. Mem."), 16, 17]. MMA submitted evidence in support of its application, including copies of the Agreement, a sworn declaration by Craig Herr, the head of the MMA office that employed the individual defendants, and certain emails Osborne had sent to himself and his team [ECF Nos. 16 ("Herr Decl."), 16-1, 16-2, 16-3, 16-4 ("Ex. D"), 16-5 ("Ex. E"), 17 ("Warner Decl.")]. MMA seeks to enjoin Defendants, "and anyone acting in active concert with Alliant," from soliciting, accepting, or servicing "clients or prospective clients" of MMA with whom its former employees had "contact" during the last two years of their employment by MMA. Proposed Order at 5–7. MMA also seeks

2

to enjoin Defendants from using or disclosing "MMA's trade secrets or Confidential Information" as defined in the Agreement. *Id.* at 6, 7. MMA further seeks to enjoin the individual defendants from "endeavoring to cause" other employees of MMA to leave MMA. *Id.* at 6.

Defendants jointly filed an opposition to the application for preliminary relief, which consists solely of a memorandum of law, devoid of any evidentiary support [ECF No. 20 ("Def. Opp.")]. The Court held a hearing on MMA's application and gave both sides the opportunity to present arguments and evidence [ECF No. 26 ("Tr.")]. Alliant declined to offer any evidence at the hearing. *See* Tr. at 21:9–16.

After the hearing, the Court issued a Temporary Restraining Order, which the Court later briefly extended [ECF Nos. 24 ("TRO"), 28]. The Court temporarily enjoined Defendants from "soliciting or accepting as clients . . . any current MMA clients with whom any of the individual defendants had business dealings while that defendant was employed by MMA during the last two years." TRO at 1. The Court also temporarily enjoined Defendants from using or disclosing two spreadsheets containing client data that Osborne obtained from MMA before he resigned, as well as "any other information or property that allegedly was misappropriated from MMA." *Id.* The Court declined to enjoin Defendants from servicing the 38 clients that, according to MMA, had already ended their relationships with MMA. *See id.*

Having carefully considered the parties' submissions and the relevant authorities, the Court makes the following findings of fact and conclusions of law pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure. In light of those findings and conclusions, the application of MMA for a preliminary injunction is GRANTED in part and DENIED in part.

## I.   FINDINGS OF FACT

### A. The Parties

MMA is an is an insurance brokerage and risk management firm, and Alliant is a direct competitor of MMA.  *See* Herr Decl. ¶¶ 3, 4.  MMA expends substantial time and resources "developing and maintaining its trade secrets and confidential client information." Herr Decl. ¶ 7.  It also "invests considerable resources to help its employees gain expertise in handling specific client needs, selling and placing insurance, managing claims, and understanding clients' historical and current insurance requirements." Herr Decl. ¶ 6.

Obsorne, Stone, and Murray all worked in MMA's Huntsville, Alabama office.  Herr Decl. ¶¶ 9–11.  Osborne was employed by MMA as a Senior Vice President who was responsible for developing and maintaining client relationships. Herr Decl. ¶¶ 5, 9.  "Osborne was responsible for a book of business for MMA, worth well over a million dollars in annually-renewing revenue, with Stone and Murray handling the day-today servicing for the majority of it, including the largest and most profitable accounts." Herr Decl. ¶ 13.

### B. The Non-Solicitation and Confidentiality Agreement

Obsorne, Stone, and Murray each signed a Non-Solicitation and Confidentiality Agreement with MMA (the "Agreement") [ECF Nos. 16-1, 16-2, 16-3].  The "Non-Solicitation Of Clients" section of the Agreement provides that, because MMA employees "come into contact with and develop and maintain relationships with [MMA] clients and prospective clients . . . solely by reason of [their] employment," the signatory employee agrees, "for a period of two (2) years following [his or her] separation" from MMA, not to "solicit clients or prospective clients" of MMA with whom the employee "had contact" or about whom the employee "obtained Confidential Information and Trade Secrets during the last two (2) years of his or her employment" by MMA.

4

Agreement § 1(a)-(b). The employee also may not do anything to "induce" such clients or prospective clients "to terminate, cancel, not renew, or not place business with" MMA. Agreement § 1(b). Further, the Non-Solicitation Of Clients section of the Agreement provides that the employee may not "perform," "supervise," or assist with "the provision or performance of services" for clients or prospective clients of MMA with whom the employee had contact during the last two years of his or her employment by MMA. Agreement § 1(b).

In a separate section, entitled "Non-Solicitation Of Employees," the Agreement provides that an employee may not, during his employment or for a period of two years thereafter, "endeavor to cause" any other employees to "leave" MMA. Agreement § 2.

The Agreement devotes several sections to "Confidential Information and Trade Secrets." Agreement §§ 4, 5. It defines that term broadly, including "financial and business information relating to the Company," "mailing lists," "new marketing ideas," information about its products, and "personnel information," among other types of information. Agreement § 4. Pertinent here, the Agreement defines Confidential Information and Trade Secrets to include: "client information, such as the identity of the Company's clients, the names of representatives of the Company's clients responsible for entering into contracts with the Company, the amounts paid by such clients to the Company, specific client needs and requirements, specific client risk characteristics, policy expiration dates, policy terms and conditions, information regarding the markets or sources with which insurance is placed, and leads and referrals to prospective clients." *Id*. In a section entitled Nondisclosure of Confidential Information and Trade Secrets, the Agreement provides, in pertinent part, that an MMA employee may not use or disclose MMA's Confidential Information and Trade Secrets, as defined in the Agreement, for any reason except as required to carry out his or her duties as an employee of MMA. Agreement § 5.

In the Agreement, the parties stipulate that MMA will suffer "irreparable injury" and will be entitled to injunctive relief if an employee breaches the non-solicitation or confidentiality provisions described above. Agreement § 10. The Agreement also provides that it is governed by New York law and that any action respecting the Agreement must be brought in this Court or a New York state court. *See* Agreement § 15.

### C. Defendants' Conduct

Based on the evidence in the record at this stage, the Court makes the following findings of fact with respect to Defendants' conduct. On Saturday, October 5, 2024, more than two months before his resignation from MMA, Osborne went to his office, scanned his Non-Solicitation and Confidentiality Agreement with MMA, and forwarded a copy to his personal email. *See* Herr Decl. ¶¶ 14–16; Ex. D.

Two days later, on Monday, October 7, 2024, Osborne emailed Murray, Stone, and other members of his team a spreadsheet he had created entitled "Osborne Client list.xlsx." Herr Decl. ¶¶ 17, 18; Ex. E. The "Osborne Client list" spreadsheet contained information about "the majority of the MMA clients within the book of business that Osborne managed (in particular, his largest accounts), with fields for client name, main point of contact (name, email, and phone number), type of policy, insurance carrier, policy number, expiration date, and premium." Herr Decl. ¶ 18. According to Herr's unrebutted declaration, MMA's "client management systems already contained" all of the information Osborne included in his spreadsheet, and he and his team were "expected to rely on these systems to access client data," rather than to create "personal spreadsheets . . . on an *ad hoc* basis." Herr Decl. ¶ 19.

Thereafter, on December 5, 2024, Osborne, using MMA printers, "printed two copies of an Excel spreadsheet titled 'JVO Master Renewal List.xlsx' (neither of which he has returned)." Herr

Decl. ¶ 20.  The "JVO Master Renewal List" spreadsheet "lists the majority of the clients within Osborne's book of business, the type of insurance policy purchased by each such client, and the renewal date for each such policy (all of which was already contained in MMA's client management systems)."  *Id.*  Notably, "[v]irtually none of the renewal dates" included in the "JVO Master Renewal List" spreadsheet was imminent.  *Id.*

On Saturday December 14, 2024, the weekend before his December 16, 2024 resignation, Osborne cleaned out his office, taking every last piece of paper and his company-issued laptop, and leaving his office "completely empty, save for his MMA-issued cell phone."  Herr Decl. ¶¶ 23, 28.  On December 16, 2024, Craig Herr, the head of MMA's Huntsville office, called and met with Osborne, who informed Herr that he was resigning effective immediately and joining Alliant.  *See* Herr Decl. ¶¶ 1, 8, 25, 26.  Osborne told Herr that Alliant had "made him a 'life-changing' compensation offer."  Herr Decl. ¶ 27.

During their December 16, 2024 meeting, Herr instructed Osborne to retrieve and return his MMA-issued laptop.  Herr Decl. ¶ 29.  When Osborne left to do so, Herr called Defendant Murray, a member of Osborne's team, who stated that "Osborne had previously informed her that he was moving to Alliant."  Herr Decl. ¶ 30.  During a meeting later that day, Murray informed Herr that she and Stone were "likely leaving MMA for Alliant as well."  *Id.*

Within days of Osborne's resignation, by December 20, 2024, "MMA had received communications from insurance carriers confirming that at least 29 clients in Osborne's book of business had submitted [broker of record ("BOR")] letters to transfer their business away from MMA."  Herr Decl. ¶ 35.  By December 30, 2024, MMA had lost 36 clients "in Osborne's book of business."  Herr Decl. ¶ 35.  Herr personally reviewed "15 of the BOR letters," and "[a]ll 15 state that the new broker of record is Alliant."  *Id*.  "Nine are dated December 17, 2024 (the day

7

after Osborne's resignation)" and "four are dated December 18, 2024." Herr Decl. ¶ 35. Herr also "received an email from an MMA client in Osborne's book of business stating, among other things, that Osborne 'reached out to us this morning,' but 'we told [Osborne] we plan to keep our business with Mar[s]h.'" Herr Decl. ¶ 37 (brackets in original). MMA also obtained an email in which Osborne instructed a client to "resend" him certain information at Alliant. Herr Decl. ¶ 38. As of the hearing on MMA's application for emergency relief, MMA had lost 38 clients in Osborne's book of business to Alliant. Tr. at 13:3–4.

## II. CONCLUSIONS OF LAW

The standards to obtain a preliminary injunction are well established. A preliminary injunction may be either prohibitory or mandatory. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* To obtain a preliminary injunction, a plaintiff must show (1) irreparable harm; (2) "either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party"; and (3) that a preliminary injunction is in the public interest. *Id.* at 37. "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)).

As discussed below, the Court concludes that MMA clearly is entitled to a prohibitory injunction against Osborne and Alliant to prevent further losses of client relationships and customer goodwill, further solicitation of MMA employees, and further use or disclosure of protected confidential information. However, the Court declines to issue MMA's Proposed Order [ECF No. 14] in its entirety.

8

### A. Irreparable Harm

Turning to the test for relief, MMA has clearly shown that it is likely to suffer irreparable harm in the form of lost clients and customer goodwill in the absence of a preliminary injunction. It is well established in the Second Circuit that a loss of client relationships and customer goodwill that results from the breach of a restrictive covenant generally constitutes irreparable harm. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 347 (S.D.N.Y. 2018); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (collecting cases); *Marsh USA Inc. v. Karasaki*, No. 08-cv-4195 (JGK), 2008 WL 4778239, at *13–14 (S.D.N.Y. Oct. 31, 2008). In particular, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co.*, 173 F.3d at 69.

The difficulty that the Second Circuit described in *Ticor* exists here. MMA has submitted evidence that "Osborne was responsible for a book of business . . . worth well over a million dollars in *annually-renewing* revenue" for MMA. Herr Decl. ¶ 13 (emphasis added). MMA has also submitted evidence that it lost dozens of clients from Osborne's book of business in the days immediately after his departure and continued to lose more such clients as time went on. *See* Herr Decl. ¶¶ 35–38; Tr. at 13:3–4. Thus, the Court concludes that it would be difficult or impossible to quantify and compensate for further losses of client relationships and customer goodwill resulting from the alleged breaches of the Agreement in this case. *See Ticor Title Ins. Co.*, 173 F.3d at 69. As such, MMA has carried its burden to show irreparable harm. *See id*; *Karasaki*, 2008 WL 4778239, at *13–14.

As MMA points out, the Agreement specifies that any violation of the non-solicitation or confidentiality provisions would constitute irreparable harm and entitle MMA to injunctive relief. *See* Pl. Mem. at 13; Agreement § 10. That contractual language is not dispositive. *See Baker's Aid, a Div. of M. Raubvogel Co. v. Hussman Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987). But it serves as an additional factor in favor of concluding that MMA has shown a likelihood of irreparable injury. *See Ticor*, 173 F.3d at 69; *Marsh USA Inc. v. Schuhriemen*, 183 F. Supp. 3d 529, 536 n.7 (S.D.N.Y. 2016), *amended*, 2016 WL 2731588 (S.D.N.Y. May 3, 2016).

### B. Likelihood of Success on the Merits

MMA has also shown a likelihood of success on the merits of at least some of its claims. *See New York Pathological & X-Ray Lab'ys, Inc. v. Immigr. & Naturalization Serv.*, 523 F.2d 79, 82 (2d Cir. 1975); *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018) ("To warrant a preliminary injunction, Plaintiffs need not show that there is a likelihood of success on the merits of all of their claims for relief. Rather, Plaintiffs need to show a likelihood of success on the merits of at least one of their claims." (cleaned up)). In particular, MMA has shown a likelihood of success on the merits of its claims that Osborne breached his Non-Solicitation and Confidentiality Agreement with MMA by misusing its confidential information, soliciting its clients to transfer their business to Alliant, and soliciting employees to leave MMA.

MMA has submitted evidence that Osborne created two "personal" spreadsheets containing client information that clearly falls within the Agreement's definition of Confidential Information and is ordinarily maintained only on MMA's client management systems. Herr Decl. ¶¶ 18, 19, 20; *see* Agreement § 4. The spreadsheets included, among other information, a list of MMA clients, the "main point of contact" for each client, policy numbers, and expiration and renewal dates for policies. Herr Decl. ¶¶ 18, 19, 20. MMA has also submitted evidence that, after his

resignation, Osborne "reached out" to a particular MMA client, which then reported the interaction to MMA. Herr Decl. ¶ 37. Furthermore, the large number of MMA clients that departed MMA for Alliant within days of Osborne's resignation, by submitting BOR letters bearing the policy numbers Osborne had compiled in his spreadsheets, "raises a strong inference" that Osborne used the information he obtained from MMA to solicit the clients to transfer their business to Alliant. *Marsh USA Inc. v. Hamby*, 28 Misc. 3d 1214(A), 958 N.Y.S.2d 61, at *5 (Sup. Ct. N.Y. Co. 2010); *see* Herr Decl. ¶ 35; Tr. at 21:14.

With respect to Osborne's solicitation of MMA employees, MMA submits evidence that Murray and Stone knew Osborne had planned to leave MMA for Alliant before he resigned and they planned to follow suit. *See* Herr Decl. ¶ 30. Indeed, MMA submits specific evidence that Osborne had "informed" Murray of his plan in advance of his resignation. *Id.* Moreover, Osborne had emailed his entire team the first spreadsheet he had created in anticipation of his departure for MMA. *See* Herr Decl. ¶¶ 17, 18; Ex. E. The Court can infer that Osborne "endeavor[ed] to cause" Stone and Murray to "leave" MMA with him. Agreement § 2; *see Hamby*, 28 Misc. 3d 1214(A), 958 N.Y.S.2d 61, at *5.

Alliant has declined to offer any evidence to rebut MMA's case that Osborne misused its confidential information and solicited its clients and employees in violation of the Agreement. *See* Tr. at 21:9–16. Rather, Alliant argues that the Agreement is unenforceable under New York law. *See* Def. Opp. at 6–10, 11–15. For that argument, Alliant relies heavily on a single New York County Commercial Division case, *Marsh USA, Inc. v. Alliant Ins. Servs., Inc.*, 49 Misc. 3d 1210(A), 26 N.Y.S.3d 725, 2015 N.Y. Slip Op. 51555(U), 2015 WL 6499525 (Sup. Ct. N.Y. Co. 2015). In that case, which involved facts similar to this case, Justice Ramos refused to issue a preliminary injunction, ruling that Marsh had failed to demonstrate a likelihood of success on its

11

breach of contract claims in light of "the presumption by New York courts that restrictive covenants contained in employment agreements are unenforceable." *Marsh*, 2015 WL 6499525, at *2. However, as another New York County Commercial Division judge has explained, the decision on which Alliant relies so heavily is an "outlier." *King v. Marsh & McLennan Agency, LLC*, 67 Misc. 3d 1203(A), 126 N.Y.S.3d 312, at *4 (Sup. Ct. N.Y. Co. 2020), *aff'd*, 191 A.D.3d 507, 138 N.Y.S.3d 323 (2021).

The landmark case on point is *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999), established the "prevailing standard of reasonableness" New York courts apply "in determining the validity" of restrictive covenants in employment agreements. *BDO Seidman*, 93 N.Y.2d at 389. Specifically, courts will enforce a restrictive covenant such as the Agreement "only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 369, 34 N.E.3d 357, 361 (2015) (quoting *BDO Seidman*, 93 N.Y.2d at 388–389); *accord Perella Weinberg Partners LLC v. Kramer*, 230 A.D.3d 451, 451, 218 N.Y.S.3d 297, 298 (2024). Contrary to the impression that Alliant attempts to create, *BDO Seidman* does not stand for the proposition that such restrictive covenants are simply unenforceable.

Rather, as Justice Ramos acknowledges in Alliant's principal case, under *BDO Seidman* and its progeny, New York courts *will* enforce a restrictive covenant "to the extent necessary to protect an employer's relationships and goodwill," *Marsh*, 2015 WL 6499525, at *3 (citing *BDO Seidman*, 93 N.Y.2d at 392), and "to the extent necessary to prevent the disclosure or use of trade secrets or confidential information," *id.* at *2 (quoting *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 308, 353 N.E.2d 590, 593 (1976)). Indeed, *BDO Seidman* itself "recognizes that an

employer has a legitimate business interest 'to prevent competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment.'" *King* 67 Misc. 3d 1203(A), 126 N.Y.S.3d 312, at *4 (quoting *BDO Seidman*, 93 N.Y.2d at 391).

In Alliant's key case, Justice Ramos appears to have overlooked the distinction between a covenant not to compete and covenants respecting solicitation and confidential information. *See Marsh*, 2015 WL 6499525, at *3; *King*, 67 Misc. 3d 1203(A), 126 N.Y.S.3d 312, at *3. As MMA correctly points out, "the Agreement does ***not*** contain a covenant not to compete." *King*, 67 Misc. 3d 1203(A), 126 N.Y.S.3d 31, at *3 (emphasis in original); *see* Pl. Mem. at 16, 17; Tr. at 7:1–2 ("Justice Ramos in his opinion refers to the covenant [at] issue as a non-compete, which it just plainly was not."). Furthermore, in numerous "New York County Commercial Division cases" and cases in this District, "courts reviewed identical or nearly identical clauses in [MMA] cases and found them valid." *King*, 67 Misc. 3d 1203(A), 126 N.Y.S.3d 31, at *4; *see Marsh & McLennan Cos., Inc. v. Feldman*, Index No. 652284/2019 (Sup. Ct. N.Y. Co. Sept. 26, 2019); *Marsh & McLennan Agency, LLC v. Joseph Ferber*, Index No. 653114/2019 (Sup Ct. N.Y. Co. Aug. 14, 2019); *Marsh USA Inc. v. Gustafson*, Index No. 652215/2016 (Sup. Ct. N.Y. Co. Apr. 28, 2016); *Marsh USA Inc. v. Ott*, Index No. 653747/2014 (Sup. Ct. N.Y. Co. Jan. 30, 2015); *Marsh USA Inc. v. Horrell*, Index No. 651216/2011 (Sup. Ct. N.Y. Co. May 18, 2011); *Hamby*, 28 Misc. 3d 1214(A), 958 N.Y.S.2d 61, at *4; *Schuhriemen*, 183 F. Supp. 3d at 534–36; *Karasaki*, 2008 WL 4778239, at *15–16; *Mercer Health & Benefits LLC*, 307 F. Supp. 3d at 351; *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 189 (S.D.N.Y. 2011); *Marsh USA Inc. v. Machua Millett et al.*, 22-cv-6656 (JMF) [ECF Nos. 13, 50].

The Court joins the great weight of authority in concluding that MMA "undeniably has a legitimate interest" in protecting its client relationships and goodwill. *King*, 67 Misc. 3d 1203(A), 126 N.Y.S.3d 31, at *4; *see also BDO Seidman*, 93 N.Y.2d at 391. Relatedly, it has a legitimate interest in limiting the solicitation of its employees to depart for its direct competitors. *See, e.g.*, *Karasaki*, 2008 WL 4778239, at *14. MMA clearly "also has a legitimate interest in preventing the misappropriation of confidential information and client lists." *King*, 67 Misc. 3d 1203(A), 126 N.Y.S.3d 31, *4 (citing *1 Model Mgt, LLC v. Kavoussi*, 82 AD3d 502, 503 (1st Dep't 2011)); *see BDO Seidman*, 93 N.Y.2d at 389.

Alliant maintains that the Agreement is overbroad in some respects and, therefore, "[e]ven if the overbroad portions aren't implicated in the instant case," the Agreement is unenforceable. Tr. at 33:8–9. It argues that the Court should not "blue pencil" the Agreement and enforce so much of the Agreement as protects MMA's legitimate interests. *Id.* at 33:11. Under New York law, an overbroad restrictive covenant is entirely unenforceable unless "the unenforceable portion is not an essential part" of the agreement, and the employer can "demonstrate[] an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct." *BDO Seidman*, 93 N.Y.2d at 394.

With respect to non-solicitation of clients, the Agreement is not overbroad. It is limited to clients or prospective clients of MMA with whom the employee had contact during the last two years of his employment with MMA. *See* Agreement § 1(b). The prohibition on soliciting such clients or prospective clients of MMA is reasonable, lasting only two years after the employee's separation from MMA. *See id.* As many courts reviewing similar agreements have concluded, this limited restriction fits comfortably within MMA's legitimate business interest in preventing "competitive use, for a time, of [client] information or relationships which . . . the employee

acquired in the course of the employment.'" *BDO Seidman*, 93 N.Y.2d at 391; *see Mercer Health & Benefits LLC*, 307 F. Supp. 3d at 349 ("New York courts have routinely found longer restrictions reasonable."); *USI Ins. Servs. LLC*, 801 F. Supp. 2d at 187–89; *Willis of New York, Inc. v. DeFelice*, 299 A.D.2d 240, 241, 750 N.Y.S.2d 39, 42 (1st Dep't 2002).

The definition of Confidential Information and Trade Secrets in the Agreement may or may not be overbroad, but the Court need not decide this question for purposes of this motion. *See Hamby*, 28 Misc. 3d 1214(A), 958 N.Y.S.2d 61, at *4 n.4. As pertinent here, the definition includes the information that Osborne compiled in the two "personal" spreadsheets he created, such as the names of MMA clients, the main point of contact for each client, the types of policies clients had, "policy expiration dates" and renewal dates, premiums, and more. Agreement § 4; Herr Decl. ¶¶ 18, 19, 20. The landmark case on point expressly recognizes a legitimate interest in "confidential customer lists." *BDO Seidman*, 93 N.Y.2d at 389. The information Osborne compiled goes far beyond mere customer lists. *See USI Ins. Servs. LLC*, 801 F. Supp. 2d at 189. Information such as the precise policies each MMA client held, when those policies would expire, and the best way to contact that client is not "readily discoverable through public sources." *Reed, Roberts Assocs., Inc.*, 40 N.Y.2d at 308, 353 N.E.2d at 594. As such, the Court concludes that MMA has a legitimate interest in protecting the client information it submits that Osborne took, and its interest in protecting that information is readily separable from any overbroad aspect of the Agreement. *See BDO Seidman*, 93 N.Y.2d at 394. Based on the record at this stage, the Court also concludes that MMA "will likely be able to demonstrate 'an absence of overreaching or other anti-competitive misconduct.'" *Schuhriemen*, 183 F. Supp. 3d at 545 (ellipsis omitted) (quoting *BDO Seidman*, 93 N.Y.2d at 394). Accordingly, the Court concludes that MMA has shown a likelihood of success

on the merits of its claims against Osborne for breaches of the non-solicitation and confidentiality provisions of the Agreement. *See Schuhriemen*, 183 F. Supp. 3d at 536.

MMA has also shown "either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring" MMA with respect to some of its claims against Alliant, including tortious interference with the Agreement. *N. Am. Soccer League, LLC*, 883 F.3d at 36. MMA alleges that Alliant induced Osborne to violate the confidentiality and non-solicitation provisions of the Agreement. *See* Cmpl. ¶¶ 161–169. "Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375, 646 N.Y.S.2d 76, 82 (1996)).

MMA offers evidence demonstrating these elements. For example, with respect to the first element, MMA offers evidence that, while planning his departure to Alliant, Osborne emailed himself a scanned copy his Non-Solicitation and Confidentiality Agreement. *See* Herr Decl. ¶¶ 14–16; Ex. D. MMA contends that Osborne was acting at Alliant's direction and "with Alliant's guidance." Pl. Mem. at 2. MMA further offers evidence that Alliant "made [Osborne] a 'life-changing' compensation offer" to convince Osborne to breach his obligations to MMA. Herr Decl. ¶ 27; *see* Pl. Mem. at 1–2. The Court has already discussed the evidence of Osborne's breaches, and the resulting loss of MMA clients and employees, above. Alliant offers no evidence to rebut that evidence. Alliant merely argues that MMA cannot succeed on its claim for tortious interference with contract because, as a matter of law, there was no valid contract to breach. *See*

16

Def. Opp. at 14 (citing *Inspirit Dev. & Constr., LLC v. GMF 157 LP*, 203 A.D.3d 430, 432 (1st Dep't 2022)).  However, the Court has already rejected that argument in concluding that the non-solicitation of clients and confidentiality provisions of the Agreement are enforceable.  *See supra*.  Furthermore, the balance of hardships clearly tips in favor of MMA with respect to an injunction prohibiting Alliant from further use of MMA's confidential information and further solicitation of its clients.  *See JTH Tax, Inc. v. Sawhney*, No. 19-cv-4035 (AJN), 2019 WL 3051760, at *7 (S.D.N.Y. July 11, 2019); *Schuhriemen*, 183 F. Supp. 3d at 537.  As such, the Court concludes that MMA has shown either a likelihood of success on the merits, or both serious questions on the merits and the balance of hardships decidedly favoring MMA, with respect to its tortious interference with contract claim against Alliant.[1]

Turning to Stone and Murray, MMA asserts only claims for breach of the non-servicing provision of the Agreement.  *See* Cmpl. ¶¶ 112–118.  The Agreement provides that former MMA employees may not "perform," "supervise," or assist with "the provision or performance of services" for clients or prospective clients of MMA with whom the employee had contact during the last two years of his or her employment by MMA.  Agreement § 1(b).  MMA has shown "either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring" MMA with respect to its claims of breach as to Stone and Murray.  *N. Am. Soccer League, LLC*, 883 F.3d at 36.

MMA offers unrebutted circumstantial evidence that Stone and Murray left MMA with Osborne, as a team, to continue servicing the same clients they had serviced as a team at MMA.  *See* Pl. Mem.  In particular, MMA submits evidence that it was Stone and Murray who "handl[ed] the day-today servicing for the majority of" Osborne's book of business, "including the largest and

---

[1] MMA has similarly shown a likelihood of success on the merits of its claim against Alliant for tortious inference with business relations.  *See Mercer Health & Benefits LLC*, 307 F. Supp. 3d at 354.

17

most profitable accounts." Herr Decl. ¶ 13. Moreover, as discussed above, Osborne sent Stone and Murray the "Osborne Client list" spreadsheet he had created in anticipation of their departure for Alliant. Herr Decl. ¶ 17; Ex. E. This evidence is sufficient to raise "serious questions on the merits" of MMA's claims against Stone and Murray for breach of the non-servicing provision of the Agreement. *N. Am. Soccer League, LLC*, 883 F.3d at 36.

Defendants respond that the Court should not enforce the non-servicing provision of the Agreement because it would inequitably burden clients who have chosen to transfer their business from MMA to Alliant. *See* Def. Opp. at 17–18. However, "numerous courts that have considered restrictive covenants prohibiting the servicing of an employee's former clients have found them to be enforceable, so long as they are otherwise reasonable in scope." *Karasaki*, 2008 WL 4778239, at *18; *see Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 539 (S.D.N.Y. 2004); *Schuhriemen*, 183 F. Supp. 3d at 537. Indeed, the landmark New York case *BDO Seidman* dealt with a non-servicing provision. *BDO Seidman*, 93 N.Y.2d at 390–92. Contrary to the defense argument, the balance of hardships decidedly favors enforcing the non-servicing provision of the Agreement, which Stone and Murray freely chose to sign, and which serves MMA's "legitimate interest" in "protection against defendant[s'] competitive use" of MMA's client relationships, prior investment in its employees, and confidential information. *Id.* at 392. Clearly, refusing to enforce the non-serving provision would create a major loophole in MMA's ability to protect the interests that *BDO Seidman* recognizes as legitimate.

### C. Public Interest

The Court concludes that the public interest clearly favors issuing a preliminary injunction against Defendants to prevent further use or disclosure of MMA's confidential information, further losses of its clients and goodwill, and further wrongful solicitation and servicing of its employees.

Clearly, such "an injunction would not contravene the public interest." *Schuhriemen*, 183 F. Supp. 3d at 537. Rather, as other courts have concluded in similar circumstances, "the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements." *Mercer Health & Benefits LLC*, 307 F. Supp. 3d at 351 (quoting *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014)). Likewise, the public interest favors discouraging Alliant from underwriting "underhanded behavior in violation of contractual obligations and [other] legal requirements." *Mountain W. Series of Lockton Companies, LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *22 (Del. Ch. June 20, 2019).

The Court will not, as MMA proposes, purport to enjoin nonparties "acting in . . . concert with Alliant." Proposed Order at 5–7. The Court "generally may not issue an order against a nonparty." *United States v. Paccione*, 964 F.2d 1269, 1275 (2d Cir. 1992). However, the Court does enjoin Defendants from supervising, assisting, or acting in concert with others to obtain, use, or disclose MMA's confidential information, to solicit, accept, or service MMA clients, or to solicit MMA employees. The Court admonishes Defendants not to attempt to circumvent or evade the restrictions imposed by this Preliminary Injunction.

### III.    CONCLUSION

Accordingly, for the reasons set forth above, MMA's motion for a preliminary injunction is GRANTED in part and DENIED in part. Pending the resolution of this case, Defendants are enjoined from: (1) soliciting, accepting, or servicing MMA clients or prospective clients with whom the individual defendants had contact, or about whom they obtained information, because of their employment with MMA during the last two years of such employment; (2) endeavoring to cause MMA employees to depart MMA; (3) using or disclosing the information contained in the

"Osborne Client list," the "JVO Master Renewal List," and any similar confidential information obtained from MMA; and (4) supervising, assisting, or otherwise acting in concert with others to evade the restrictions enumerated above.

Pursuant to Rule 65(c), MMA shall post of a bond in the amount of $300,0000 to provide security in the event that Defendants have been wrongfully restrained. *See Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

**SO ORDERED.**

Date:  January 27, 2025
       New York, NY

                                              **MARY KAY VYSKOCIL**
                                              **United States District Judge**